UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| LARRY M. SEVERSON,<br><br>                    Petitioner,<br><br>vs.<br><br>JAY CHRISTENSEN, ISCC Warden,<br><br>                    Respondent. | Case No. 1:20-cv-00429-REP<br><br>**MEMORANDUM DECISION AND ORDER** |

Earlier in this habeas corpus matter filed by Petitioner Larry M. Severson, the Court granted in part and denied in part Respondent Jay Christensen's Motion for Summary Dismissal. Dkts. 23, 54. The Court concluded that Claim 2 was procedurally defaulted and also subject to dismissal for failure to state a claim. *See* Dkt. 54. In the same Order, the Court gave notice that, at the next phase of proceedings, the parties could present additional argument on claims addressed in the summary dismissal motion. The Court overrules Severson's objections about the procedural impropriety of Respondent readdressing claims in his Answer and Brief in Support of Dismissal. *See* Dkts. 58; 72, pp. 10-2.

After Respondent filed an Answer, Severson filed a Reply, and Respondent filed a Sur-Reply. Dkts. 58, 72, 73. Claim 1 and Claims 3 through 11 are now fully briefed. All

**MEMORANDUM DECISION AND ORDER - 1**

named parties have consented to the jurisdiction of a United States Magistrate Judge to enter final orders in this case. Dkts. 5, 6. *See* 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

The Court takes judicial notice of the record from Severson's state court proceedings. *See* Fed. R. Evid. 201(b); *Dawson v. Mahoney*, 451 F.3d 550, 551 n.1 (9th Cir. 2006). The Court has carefully reviewed the state and federal record in this matter, has considered the arguments of the parties, and has concluded that oral argument is unnecessary. *See* D. Idaho L. Civ. R. 7.1(d). For the reasons set forth below, the Court enters this Order denying the Petition for Writ of Habeas Corpus and dismissing it with prejudice.

## BACKGROUND

In this matter, the Court will refer to Larry Severson as "Severson," and Mary Severson as "Mary." The following facts, as described by the Idaho Supreme Court, are presumed correct under 28 U.S.C. § 2254(e)(1), because no clear and convincing evidence to the contrary has been presented:

> Larry and Mary Severson met in Colorado in 1995.[1] After dating for a little over one year, the couple married and moved to Mountain Home, Idaho. By 2001, Severson and Mary began experiencing marital problems. Then, in August 2001, the couple separated after Mary learned that Severson was having an affair with a younger woman. Upon learning of the affair, Mary left Severson and returned to Colorado to stay with her mother.
>
> Initially, Mary and Severson planned on getting an uncontested divorce. Less than four months after the couple separated, however, Mary changed her mind. Instead of going

**MEMORANDUM DECISION AND ORDER - 2**

forward with the divorce, Mary decided to return to Idaho and work on her marriage. In the meantime, Severson continued to see his younger girlfriend, Jennifer Watkins. Severson told Watkins that he and Mary were still getting divorced and even asked Watkins to marry him. Watkins initially accepted Severson's proposal but ended up breaking off the relationship before Mary returned to Idaho.

Mary arrived back in Idaho in December 2001. Once she returned, she and Severson went to the local GNC store so she could purchase some Hydroxycut pills. Mary had started taking Hydroxycut while she was in Colorado in order to help her lose weight. During that time, the pills did not cause her to suffer any adverse side effects. Shortly after Mary began taking the pills she purchased with Severson, however, she started experiencing stomach pain and vomiting blood. This prompted Mary to inspect the pills and, upon doing so, she noticed that they were discolored and warm to the touch. Mary immediately quit taking the pills and scheduled an appointment with her doctor. At the doctor's office, Mary was diagnosed with an ulcer and given a prescription for Prevacid. During a follow-up examination, she also received a prescription for the sleep aid Ambien.

On February 14, 2002, Severson called Mary's doctor and requested a refill of Mary's Ambien prescription. The doctor authorized the refill and Severson picked up the prescription later that same night. The next morning, at approximately 3:00 a.m., Severson purportedly discovered Mary lying on the couch not breathing. Upon finding his wife, Severson called his son and daughter-in-law, Mike and Nora, who immediately rushed to Severson's house. Once there, Nora called 911 and Mike began performing CPR on Mary. Before long, the paramedics arrived and transported Mary to the hospital. Efforts to resuscitate Mary continued in the ambulance and at the hospital, but were ultimately unsuccessful. Mary was pronounced dead at the hospital at approximately 4:15 a.m. that same morning. An autopsy revealed that Mary had ingested significant amounts of the

**MEMORANDUM DECISION AND ORDER - 3**

> sleep aids Ambien and Unisom; however, her cause of death was listed as "undetermined."
>
> Less than one day passed before the police began investigating Severson's role in Mary's death. Searches of Severson's home and workplace revealed several pieces of evidence including a cardboard tray with broken pieces of Hydroxycut capsules, a pharmacy receipt for Ambien, Ambien pills under a couch cushion where Mary was discovered, a plastic baggie containing Unisom pills that was hidden inside a hat with the word "dad" printed on it, Unisom tablets in Mary's bathroom and car, and an empty Ambien prescription bottle. Additionally, two bottles of Hydroxycut and an envelope containing some contaminated pills were recovered from Severson's attorney, Jay Clark.

State's Lodging B-8, pp. 1-3.

Severson was indicted by a grand jury for the separate crimes of murder in the first degree by overdosing Mary with sleeping pills and of poisoning her food and/or medicine. *See* State's Lodging A-1, p. 16. Severson was represented at trial by Elmore County Public Defender E.R. Frachiseur and private attorney Ellison Matthews. As noted below, various other counsel represented Severson in pretrial proceedings. Elmore County Prosecutor Aaron Bazzoli and Idaho Deputy Attorney General Ronald Howen prosecuted the case. *See* State's Lodging A-17, p 4. Originally, the case was designated as one "in which the death penalty may be imposed." State's Lodging A-2, pp. 266, 342-56. On June 3, 2004, the prosecutor gave notice that the State would not seek the death penalty. *See* State's Lodging A-5, p. 68.

**MEMORANDUM DECISION AND ORDER - 4**

The Honorable Michael E. Wetherell presided over pretrial proceedings, the jury trial, and the sentencing hearing. After a 17-day jury trial in the Fourth Judicial District Court in Elmore County, Idaho, Severson was convicted of both poisoning and murdering Mary. Severson was sentenced to life in prison without parole for the murder, with a concurrent sentence of five years for the poisoning.

Severson filed a direct appeal and multiple post-conviction actions in state court before proceeding to federal court. The procedural history is accurately set forth at length in Respondent's Answer and Brief in Support of Dismissal and will not be repeated here. *See* Dkt. 58, pp. 4-9. The Court will adopt Respondent's abbreviated references to each state action and its corresponding appeal, that is, "*Severson I*" for the direct appeal, and so forth.

## PROCEDURAL DEFAULT STANDARD OF LAW

A petitioner must "properly exhaust" his state court remedies before pursuing a claim in a federal habeas petition. 28 U.S.C. § 2254(b). That means "fairly presenting the claim" based on a federal theory to the highest state court for review in the manner prescribed by state law. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Unless a petitioner has properly exhausted his state court remedies for a particular claim, a federal district court cannot grant relief on that claim, although it does have the discretion to deny the claim. 28 U.S.C. § 2254(b)(2).

**MEMORANDUM DECISION AND ORDER - 5**

State remedies are considered technically exhausted, but not *properly* exhausted, if a petitioner failed to pursue a federal claim in state court and there are no remedies now available. *O'Sullivan*, 526 U.S. at 848. A claim may also be considered exhausted, though not properly exhausted, if a petitioner pursued a federal claim in state court, but the state court rejected the claim on an independent and adequate state law procedural ground. *Coleman v. Thompson*, 501 U.S. 722, 731-732 (1991). If a claim has not been properly exhausted in the state court system, the claim is considered "procedurally defaulted." *Id*. at 731. A procedurally defaulted claim will not be heard in federal court unless the petitioner shows either that there was legitimate cause for the default and that prejudice resulted from the default, or, alternatively, that the petitioner is actually innocent and a miscarriage of justice would occur if the federal claim is not heard. *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

Here and in the previous Order, the Court has determined that some of Severson's claims are procedurally defaulted. No additional opportunity to provide cause and prejudice arguments will be granted because the Court alternatively denies each of the claims on the merits. *See Lambrix v. Singletary*, 520 U.S. 518 (1997) (holding that federal courts are not required to address a procedural issue before deciding against the petitioner on the merits); *cf*. 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

**MEMORANDUM DECISION AND ORDER - 6**

## MERITS STANDARD OF LAW

Federal habeas corpus relief may be granted where a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Where petitioners challenge a state court judgment that adjudicated their federal claims on the merits, Title 28 U.S.C. § 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), applies. Title 28 U.S.C. § 2254(d) is a deferential standard that limits relief to instances where the state court's adjudication of the petitioner's claim:

> 1. resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> 2. resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

To assess whether habeas corpus review is warranted, the federal district court reviews "the last state-court adjudication on the merits." *Greene v. Fisher*, 565 U.S. 34, 39 (2011). The deferential standard of § 2254(d) applies regardless of whether the state court decision "is unaccompanied by an opinion explaining the reasons relief has been denied." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

Where the state's highest court did not issue a reasoned decision, courts review the decision of the lower appellate courts, using the "look through" principle of *Ylst v.*

**MEMORANDUM DECISION AND ORDER - 7**

*Nunnemaker*, 501 U.S. 797 (1991), and "presume the higher court agreed with and adopted the reasons given by the lower court." *Curiel v. Miller*, 830 F.3d 864 (9th Cir. 2016). Where "the last reasoned opinion on the claim explicitly imposes a procedural default," the federal district court "presume(s) that a later decision rejecting the claim did not silently disregard that bar and consider the merits," *Ylst*, 501 U.S., at 803; however, that presumption can be refuted by "strong evidence." *Kernan v. Hinojosa*, 578 U.S. 412, 415 (2016).

Where a petitioner contests the state court's legal conclusions, including application of the law to the facts, § 2254(d)(1) governs. That section consists of two alternative tests: the "contrary to" test and the "unreasonable application" test.

Under the first test, a state court's decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court] [has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002).

Under the second test, to satisfy the "unreasonable application" clause of § 2254(d)(1), the petitioner must show that the state court identified "the correct governing legal rule" from Supreme Court precedent but "unreasonably applie[d] it to the facts of the particular state prisoner's case." *Williams (Terry) v. Taylor*, 529 U.S. 362, 407 (2000). Section 2254(d)(1) "does not require state courts to *extend* that precedent or

MEMORANDUM DECISION AND ORDER - 8

license federal courts to treat the failure to do so as error." *White v. Woodall*, 572 U.S. 415, 426 (2014) (emphasis in original).

A federal court cannot grant habeas relief simply because it concludes in its independent judgment that the state court's decision is incorrect or wrong; rather, the state court's application of federal law must be *objectively* unreasonable to warrant relief. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell*, 535 U.S. at 694. The Supreme Court emphasized that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (internal citation omitted). *Richter*, 562 U.S. at 101.

In *Yarborough v. Alvarado*, 541 U.S. 652 (2004), the Supreme Court interpreted the "unreasonable application" standard as whether "fairminded jurists could disagree" with the state court decision. *Id*. at 664. More recent decisions restate the standard of law in more understandable language, such as: "The prisoner must show that the state court's decision is so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement.'" *Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020) (citing *Richter*, 562 U.S. at 103). This means that, if *any* fairminded jurist could take a different view from the way the state appellate court resolved the claim, habeas corpus relief is not warranted. *Id*. at 525. If *all* fairminded jurists would agree that resolution of the claim was "an error well understood and comprehended in existing law," then relief under § 2254(d)(2) is warranted. *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (citation omitted).

The source of clearly established federal law must come from the holdings of the United States Supreme Court, but the district court may rely on circuit precedent as persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999). Circuit law may not be used "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

The foregoing standard is AEDPA's § 2254(d)(1) deferential standard. De novo review applies only in particular circumstances—where the state appellate court did not decide a properly-asserted federal claim, where the state court's factual findings are unreasonable under § 2254(d)(2), or where an adequate excuse for the procedural default of a claim exists. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). In such a case, as in the pre-AEDPA era, a district court can draw from both United States Supreme Court and well as circuit precedent, limited only by the non-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989).

Under both AEDPA deferential and de novo review, if the factual findings of the state court are not unreasonable, the federal district court must apply the presumption of correctness found in 28 U.S.C. § 2254(e)(1) to any facts found by the state courts. *Pirtle*, 313 F.3d at 1167. Contrarily, if a state court factual determination is unreasonable, or if there are no state court factual findings and the claim is properly before the court, the

**MEMORANDUM DECISION AND ORDER - 10**

district is not limited by § 2254(e)(1) and may consider evidence outside the state court record, except to the extent that § 2254(e)(2) might apply. *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014).

If a petitioner succeeds in showing a constitutional violation under either the AEDPA deferential or de novo review standard, habeas corpus relief is not automatic. The petitioner must also establish that the error resulted in "actual prejudice." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Under the *Brecht* standard, an error is not harmless, and habeas relief must be granted, if the federal court has "grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (internal quotation marks omitted). However, some types of claims "are analyzed under their own harmless error [or prejudice] standards, which can render *Brecht* analysis unnecessary." *Jackson v. Brown*, 513 F.3d 1057, 1070 (9th Cir. 2008). Ineffective assistance of counsel claims are included in this category. *Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009). The bottom line is that, if the constitutional error did not result in actual prejudice to the defense, federal habeas corpus relief must be denied.

## REVIEW OF MERITS OF REMAINING CLAIMS

### 1. Discussion of Claim 1: Attorney Conflict of Interest Claim

Claim 1 is that the state district court violated Severson's Sixth Amendment right to effective assistance of counsel when it (1) failed to make an adequate and meaningful

inquiry into the nature and extent of Severson's public defenders' conflict of interest; (2) erroneously concluded that the conflict did not require disqualification of the Elmore County Public Defender's Office; and (3) did not obtain a waiver of the conflict of interest from Severson before permitting the public defender to continue representing him. Dkt. 1, p. 17; Dkt. 72, p. 4.

On December 2, 2002, Severson appeared in court with his attorneys Jay Clark and Christ Troupis and was advised of the indictment, the nature of his charges, and his rights. By January 2003, a third attorney, Scott Summer, had been added. None of these attorneys was death penalty qualified, and the death penalty was at issue. *See* State's Lodgings A-1, pp. 58, 90.

On December 9, 2002, attorney Terry Ratliff, who was in private practice and also provided defense work for indigent defendants through the Elmore Public Defenders' Office, filed a formal civil probate matter for the estate of victim Mary Severson, representing her mother, Carolyn "Carole" Diaz, in Case No. CV-2002-1413 ("Case 1413" or "the probate case"). Judge Wetherell, who presided over Severson's criminal case, presided over Case 1413 from August 12, 2003, until September 19, 2003, when he entered an "Order to Disqualify Judge without Cause," and Judge Ronald Wilper was assigned the case. *See* Exhibit A, Idaho Supreme Court Register of Actions, Case 1413.

On September 25, 2002, in Elmore County Case No. CV-2002-769 ("Case 769" or "the insurance case"), United Investors Life Insurance Company filed a civil interpleader

**MEMORANDUM DECISION AND ORDER - 12**

complaint, naming Severson and Ms. Diaz as defendants, and it filed the proceeds of the policy, $200,000, with the court. *See United Investors. Life Insurance Co. v. Severson*, 151 P.3d 824, 827 (2007). At issue in that case was whether Severson was prohibited from obtaining a community property share of Mary's life insurance proceeds, because of Idaho's "slayer statute," I.C. § 15-2-803. Severson was represented by Mr. Troupis and Mr. Clark; Ms. Diaz was represented by attorney Mitchell Egusquiza. Originally, Judge Darla Williamson was assigned to the case. On January 6, 2003, the case was reassigned to Judge Wetherell. *See* Exhibit A, Idaho Supreme Court Register of Actions, Case 769.

Attorney E.R. Frachiseur worked as an Elmore County deputy public defender with Mr. Ratliff. In conversation, Elmore County Prosecutor Aaron Bazzoli, who was prosecuting Severson's criminal case, mentioned to Mr. Ratliff and Mr. Frachiseur that Severson's defense attorneys (Clark, Troupis, and Summer) had interviewed less than half of the witnesses in the case.[1]

In the insurance case, on July 28, 2003, Judge Wetherell granted Ms. Diaz partial summary judgment, finding she was entitled to $100,000, because she was the beneficiary of the $200,000 life insurance proceeds but that one half community property interest ($100,000) was vested in Severson. *United Investors*, 151 P.3d at 631. The

---

[1] Prior to representing Larry Severson, Mr. Clark had previously represented Mary Severson. The prosecutor sought Clark's files related to his prior representation of Mary. On October 31, 2003, Clark filed an affidavit objecting to the prosecutor's request. *See* State's Lodging A-2, p. 108-111. Clark was later removed as counsel because he was subpoenaed to testify at Severson's trial. Clark's sequential representation of the victim and defendant is not at issue.

**MEMORANDUM DECISION AND ORDER - 13**

remainder of the case had to wait until Severson's criminal case was completed. *See*

Exhibit A.

On August 21, 2003, Mr. Ratliff (who represented Ms. Diaz in the probate case

but not the insurance case) sent a letter to Judge Wetherell about Severson's criminal

case. Mr. Ratliff stated, that, as an officer of the court and an attorney who opposed the

death penalty, Mr. Ratliff felt he had a duty to notify the Court that Mr. Bazzoli told him

and Mr. Frachiseur that defense attorneys Clark, Troupis, and Summer were providing

inadequate representation to Severson. State's Lodging B-1, Att. 1, p. 1 ("Ratliff Letter").

Mr. Ratliff also informed Judge Wetherell:

> In as much as I am an attorney on a related probate
> case of the deceased, I cannot be appointed to represent Mr.
> Severson in this case. Therefore, I have no financial reason to
> bring these matters to lite and am only doing so after
> deliberate observation and consideration of the ramifications
> of this letter.

*Id.*, p. 7 (verbatim).

On October 21, 2003, Mr. Summer filed a motion for appointment of death

penalty qualified counsel. State's Lodging A-2, p. 95. On October 25, 2003, Mr. Troupis

filed a stipulation for withdrawal of counsel, bearing Severson's signature. *Id.*, p. 93. On

October 31, 2003, Judge Wetherell entered an Order stating that, "to the best of the

court's knowledge, Mr. Summer does not possess the necessary qualifications to merit

appointment as either lead or co-counsel in a capital case. In the event that the defendant

decides that he wants the court to appoint counsel for him, the court believes that it is

**MEMORANDUM DECISION AND ORDER - 14**

required to appoint death penalty qualified counsel. In this case that would be either through the Elmore County public defender's office or counsel appointed through that office." *Id.*, p. 104. The court set a hearing on the representation issues for November 4, 2003. *Id.*

At the hearing, Judge Wetherell appointed the Elmore County Public Defender to represent Severson, and authorized Mr. Frachiseur of that office to associate counsel who was death penalty qualified. *Id.*, p. 116. Mr. Summer requested that he be allowed to remain as co-counsel at county expense, but Mr. Frachiseur and Mr. Bazzoli informed the court that any co-counsel must be death penalty qualified, and that Mr. Summer was not. State's Lodging A-16, pp. 196-97. Mr. Summer and Mr. Troupis were withdrawn from representing Severson. *Id.*

Several days later, the court appointed Robert Chastain, an attorney in private practice, as Mr. Frachiseur's co-counsel. State's Lodging A-2, p. 291. Mr. Frachiseur later associated death penalty qualified attorney Ellison Matthews, who participated in the jury trial.

On January 13, 2004, Mr. Chastain wrote a letter to co-counsel Mr. Frachiseur relaying their client Severson's concerns that the Elmore County public defender had a conflict of interest in his case because Mr. Frachiseur represented Severson in the criminal case and Mr. Ratliff represented the victim's mother in a related civil case. State's Lodging B-3, Att. 1 ("Chastain Letter"). The letter indicated that counsel should

**MEMORANDUM DECISION AND ORDER - 15**

request a hearing on the conflict of interest issue. *Id.* Severson received a copy of the letter. *Id.*

In a hearing on January 16, 2004, Mr. Chastain gave Judge Wetherell a copy of the Chastain letter. State's Lodging A-16, pp. 291-92. Judge Wetherell took a recess to review the letter. In response to questioning from the court, Mr. Frachiseur informed the court that Mr. Ratliff was a salaried deputy public defender for Elmore County, and not simply a conflict counsel. *Id.*, pp. 292-93. Mr. Frachiseur told the court that Mr. Ratliff had assured him that he was going to withdraw from his representation of Ms. Diaz. *Id.*, p. 303. Mr. Frachiseur told the court that, when he was originally appointed to represent Severson, he "wasn't aware of" Mr. Ratliff's representation of Ms. Diaz. *Id.* Judge Wetherell set the conflict of interest issue for a hearing. *Id.*

Also on January 16, 2004, Severson filed a pro se "Objection to Removal of Counsel of Choice Motion to Reinstate Counsel," with Affidavit, in which he complained about the removal of Mr. Summer as his attorney and addressed the public defenders' conflict issue:

> Part of my concern is that I believe Mr. Frachiseur is operating under a conflict of interest. I believe that a conflict is responsible for removal of Mr. Summer. At hearings I see Mr. Terry Ratliff, a Mountain Home attorney, conferring with Mr. Frachiseur and passing notes to Mr. Frachiseur about my case. Mr. Ratliff wrote a letter to the Court dated August 21, 2003, in which he claimed that Mr. Summer was not representing me adequately. I would appreciate Mr. Ratliff's concern for my well-being and for the integrity of the judicial process, if that is what it was, but Mr. Ratliff is involved in a

**MEMORANDUM DECISION AND ORDER - 16**

> civil lawsuit directly related to the criminal cases against me.
> At the time he wrote that letter Mr. Ratliff represented my
> mother-in-law, the mother of the alleged victim, in a civil
> dispute over the proceeds of an insurance policy on the life of
> the alleged victim. My conviction would assure that Mr.
> Ratliff and his client collected an additional $80,000.00. I am
> informed that Mr. Ratliff and Mr. Frachiseur have a
> professional, contractual relationship as well as being long-
> term friends.

State's Lodging A-3, p. 394.

On February 2, 2004, Judge Wetherell held an evidentiary hearing on the attorney

conflict of interest issue in Severson's criminal case. State's Lodgings A-4, pp. 598-99;

A-16, pp. 329-331. Neither side called witnesses. Mr. Frachiseur advised the court that

Mr. Ratliff had, in fact, withdrawn from representation of Ms. Diaz in the probate case.[2]

The court identified Mr. Ratliff's representation of the victim's mother in the civil

case as "the major issue" in the conflict of interest determination (Case 1413). In

addition, the court noted, "the civil case, with regard to at least a significant number of

issues, was resolved and that the appeal in the civil case was dropped, and the one-half of

the proceeds from the insurance had been ordered turned over to the Plaintiffs in that

---

[2] The Register of Actions in Case 1413, the probate case, shows that, on January 27, 2004, an order
allowing counsel to withdraw was entered. The register of actions shows that Mr. Egusquiza (who
represented Ms. Diaz in Case 769), replaced Mr. Ratliff as counsel for Ms. Diaz in Case 1413. The Court
takes judicial notice of the Idaho Supreme Court public Register of Actions in the probate case, which
confirms that Mr. Ratliff withdrew before Mr. Frachiseur made that representation at the hearing, and of
the Register of Actions in the insurance case, which shows Mr. Ratliff was not counsel of record in that
case. Neither Register of Actions shows that Mr. Frachiseur was counsel of record in either civil case. *See*
Exhibit A to this Order; Rule 7 of the Rules Governing Section 2254 Cases (giving a federal court the
authority to expand the existing state court record with "materials relating to the petition").

**MEMORANDUM DECISION AND ORDER - 17**

case, and that Mr. Ratliff would no longer have any financial interest in any further

proceedings in that case" (Case 787).[3] State's Lodging A-16, p. 330.

In the conflict of interest hearing, Judge Wetherell asked Severson whether he

would like to add or tell the court anything, and Severson said no. Severson now asserts

that he did not make any argument or introduce any evidence at the evidentiary hearing

because "all concerns had been covered via: Mr. Chastain's letter and argument to the

court in his behalf." Dkt. 74, p. 4. Mr. Chastain's letter contains no specific factual

allegations that would support a finding of a conflict of interest other than identification

of Mr. Ratliff's representation of Ms. Diaz. *See* State's Lodging B-3, Att. 1.

After the hearing, Judge Wetherell determined that removal of the Elmore County

Public Defender was not justified because Mr. Ratliff had withdrawn from the civil case.

State's Lodging A-16, pp. 329-31. Judge Wetherell concluded that, although Mr. Ratliff

was conflicted and could not represent Severson based on his prior representation of Ms.

Diaz, his conflict was not imputed to Mr. Frachiseur, because the Elmore County Public

Defender's Office was not a "firm." State's Lodging A-4, p. 669. Nevertheless, Judge

Wetherell took precautionary measures of requiring the Elmore County Public

---

[3] In the insurance case, Judge Wetherell entered a Rule 54(b) Order, permitting immediate appeal of the distribution of the one-half the proceeds to the named beneficiary of the life insurance policy, Carolyn Diaz. It appears that Severson did not finish pursing an appeal of that decision, but appealed the later decision, entered after he was convicted, that he was not entitled to the other half of the proceeds. *See United Investors,* 151 P.3d at 830. There are no allegations before this Court regarding judicial recusal in any of the state court actions over which Judge Wetherell presided.

**MEMORANDUM DECISION AND ORDER - 18**

Defender's Office to "completely screen Mr. Ratliff from involvement in any activities or information relating to this case." *Id.*, p. 671.

The Sixth Amendment guarantees the right to be represented by conflict-free counsel. *Woods v. Georgia*, 450 U.S. 261, 271 (1981). Where the trial court "knows or reasonably should know that a particular conflict exists," the court must conduct an inquiry into the conflict. *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980) (holding that prejudice is presumed in joint representation cases); *see also Holloway v. Arkansas*, 435 U.S. 475, 489 (1978) (same).

The *Sullivan* standard was developed in the context of multiple concurrent criminal defendant representation—a circumstance not found in Severson's case. In *Mickens v. Taylor*, 535 U.S. 162, 170 (2002), the court observed that, "[b]oth *Sullivan* itself, *see id*. at 348–349, and *Holloway*, *see* 435 U.S. at 490–491, stressed the high probability of prejudice arising from multiple concurrent representation, and the difficulty of proving that prejudice." *Id*. at 175.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Court clarified that the *Sullivan* rule is that "prejudice is presumed when counsel is burdened by an actual conflict of interest." *Id*. at 692. An actual conflict of interest is shown when the "defendant demonstrates counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Id*. (citing Sullivan, 446 U.S. at 350). In *Mickens*, the Court held that the *Sullivan* rule should not be

**MEMORANDUM DECISION AND ORDER - 19**

applied "'unblinkingly' to 'all kinds of alleged attorney ethical conflicts,'" and "it was at least necessary, to void the conviction, for petitioner to establish that the conflict of interest adversely affected his counsel's performance." *Id.*, p. 174.

The United States Supreme Court has not addressed *imputed* disqualification at all; nor has it addressed the more particular issue of whether imputed disqualification applies to a public defender's office. What *is* clearly established is that (1) a trial court must conduct an inquiry into potential conflicts of which it is aware,[4] and (2) the defendant must show the existence of an actual conflict of interest "*that affected counsel's performance—as opposed to a mere theoretical division of loyalties.*" *Mickens*, 535 U.S. at 171 (emphasis in original). Beyond that, the contours of the law have not been clearly established. To the extent that the Idaho Supreme Court applied Idaho law and American Bar Association or state attorney ethical rules to the facts in Severson's state appellate cases, those applications are not at issue in this federal habeas corpus case.

In *Severson I*, the Idaho Supreme Court found that Mr. Ratliff had a conflict of interest, meaning *Mr. Ratliff* could not have represented Severson, but Mr. Frachiseur did not have a conflict based on Mr. Ratliff's representation of the victim's mother. State's Lodging B-8, pp. 9-13. The Court found no evidence in the record that Mr. Frachiseur was involved in Ms. Diaz's case. *Id.*, p. 5, n.6. The Idaho Supreme Court agreed with

---

[4] In *Mickens*, the Court emphasized that "the trial court's failure to make a *Sullivan*-mandated inquiry does not reduce the petitioner's burden of proof" to show an actual conflict of interest. 535 U.S. at 174.

Judge Wetherell's reasoning that, because the Elmore County Public Defender's Office served an important public function and was not a "firm," Mr. Ratliff's conflict should not be imputed to Mr. Frachiseur. In deciding that the representation did not present a significant likelihood of prejudice, Judge Wetherell reasoned, and the Idaho Supreme Court agreed, that:

> automatically disqualifying a public defender where another attorney in the office has a conflict of interest would significantly hamper the ability to provide legal representation to indigent clients. This, together with the fact that such concurrent representation by public defenders generally will create no incentive (economic or otherwise) for diminished advocacy in such cases, convinces us that a per se rule imputing conflicts of interest to affiliated public defenders is inappropriate where there is no indication the conflict would hamper an attorney's ability to effectively represent a client.

*Id.*, p. 11.

The Idaho Supreme Court further agreed that Judge Wetherell's decision to direct the Public Defender's Office to completely screen Mr. Ratliff from involvement in any activities or information relating to Severson's case was an appropriate additional precaution. *Id.*, pp. 8-9.

This Court concludes the record in this case demonstrates the trial court conducted a proper inquiry into the potential conflict of interest. Severson contends that Judge Wetherell did not fully inquire about all the facts necessary to determine whether Mr. Ratliff's conflict of interest should be imputed to Mr. Frachiseur. But the vital inquiry at

**MEMORANDUM DECISION AND ORDER - 21**

issue was narrow, and the trial court properly relied upon counsel to bring forward any other evidence that supported Severson's conflict argument. Where the defendant is represented by conflict-free counsel, like Mr. Chastain, a court has no additional duty to ask questions about matters counsel can raise. And the state district court appropriately relied on Mr. Frachiseur's representations, as courts "necessarily rely in large measure upon the good faith and good judgment of defense counsel." *Burger v. Kemp*, 483 U.S. 776, 784 (1987) (quoting *Sullivan*, 446 U.S. at 347).

Severson argues that a conflict was obvious because (1) Mr. Ratliff spoke to the prosecutor about Severson's case, (2) because Ratliff and Frachiseur were friends, and (3) because the two attorneys passed notes back and forth to each other during hearings. These allegations are too speculative to support a finding of an actual conflict of interest. Severson—represented at the hearing by Mr. Chastain, who was not implicated in the asserted conflict—presented no evidence to flesh out these allegations that would nudge Severson's speculation into fact.

This Court concludes that the Idaho Supreme Court reasonably applied principles from United States Supreme Court precedent to Severson's case. The record comports with the minimal requirements imposed by the federal Constitution. Accordingly, the Court concludes that the Idaho Supreme Court's decision is entitled to deference under AEDPA. Claim 1 will be denied on the merits.

**MEMORANDUM DECISION AND ORDER - 22**

Alternatively, under a de novo review standard, the Court concludes that Severson has shown no actual prejudice to his defense as a result of Mr. Frachiseur's continued representation of him, especially given that Severson was also represented by co-counsel Mr. Chastain or Mr. Matthews, both private counsel not a part of the public defender's office, during the criminal proceedings. Therefore, this claim is subject to denial under a de novo standard of law.

### 2. Discussion of Claim 2: Grand Jury Indictment

Claim 2 is that Severson was deprived of his constitutional right to have a grand jury investigate and indict him for committing murder *by suffocation*, and, therefore, the trial could lacked jurisdiction to instruct the jury that it could find him guilty of murder in that manner. Dkt. 1, p. 21.

The Idaho grand jury considered the allegation that Severson killed his wife by suffocation, but failed to return an indictment on that allegation. Over Severson's objection, the trial court permitted the prosecutor to amend the indictment to include this new charge on January 5, 2004. State's Lodgings A-2, pp. 269; A-3, pp. 373-376. Trial commenced on October 6, 2004.

On direct appeal in *Severson I*, Severson's counsel labeled the claim a deprivation of a "constitutional right" but argued it only under the state constitution, focusing on jurisdiction. *See* State's Lodging B-5, pp. 34-36. Counsel likely chose that path because Severson had no viable federal constitutional claim, as the Court explains below. The

**MEMORANDUM DECISION AND ORDER - 23**

State attempted to recharacterize the argument as a "due process" claim, but this theory, too, was addressed by the appellate court exclusively under the state constitution. *See* State's Lodging B-8, p. 14 n.14.

To the extent that Severson brings his grand jury claim under the federal Due Process Clause (rather than under state law as he did on direct appeal), it is procedurally defaulted and subject to dismissal, because it is now too late to properly present the claim to the Idaho Supreme Court.

Alternatively, this claim fails to state a claim upon which relief can be granted under a de novo review standard. The United States Supreme Court has long held that there is no federally protected right to indictment by a grand jury in state criminal proceedings. *Hurtado v. California*, 110 U.S. 516 (1884); *Alexander v. Louisiana*, 405 U.S. 625, 633 (1972). *See also United States v. Jordan*, 291 F.3d 1091, 1095 n. 2 (9th Cir. 2002); *Gautt v. Lewis*, 489 F.3d 993, 1003 n.10 (9th Cir. 2007) ("this Fifth Amendment right has not been incorporated into the Fourteenth Amendment so as to apply against the states").

Accordingly, the Court concludes that Claim 2 is subject to dismissal because it is procedurally defaulted and subject to denial for failure to state a federal claim under a de novo standard of review. The Court further notes that the record reflects that Severson was adequately informed of the amended charge, and he and his counsel had 11 months after amendment to prepare and defend against it.

**MEMORANDUM DECISION AND ORDER - 24**

### 3. Discussion of Claim 3: Unanimous Jury Verdict

Claim 3 is that Severson was denied his constitutional right to a unanimous jury

verdict when the trial court failed to give the jury a unanimity instruction. Dkt. 1, p. 24.

Severson asked for a particular unanimity instruction requiring the jury to agree on the

cause of death—overdose, suffocation, or both. The trial court declined and instead

instructed the jury that Severson could be found guilty of first degree murder if the jurors

determined that he killed his wife by overdosing her with sleeping pills and/or

suffocating her. State's Lodging A-9 (Instruction no. 20); State's Lodging A-17, pp.

3938-3975.

On appeal, Severson cited the Idaho Constitution, two Idaho statutes, and an Idaho

criminal rule in support of his claim. *See* State's Lodging B-5, p. 51. The Idaho Supreme

Court analyzed whether Severson's rights to a unanimous jury verdict were violated.

State's Lodging B-8, pp. 16-19. The Idaho Supreme Court cited state case law, state

statutes, and the Idaho Constitution. That court also cited *Schad v. Arizona*, 501 U.S. 624,

630-31 (1991) (plurality opinion), for the principle that the United States Supreme Court

has "never suggested that in returning general verdicts … jurors should be required to

agree upon a single means of commission."[5] State's Lodging B-8, p. 18. The Idaho

---

[5] After Petitioner's conviction, *Schad* was overruled on other grounds not relevant here by *Ramos v. Louisiana*, 140 S.Ct. 1390 (2020) (state jury must be unanimous to convict a criminal defendant of a serious offense). Petitioner's jury verdict complied with the *Ramos* rule, because the jurors all agreed that

Supreme Court performed an extensive due process analysis under *Schad*. *See id*., pp. 17-24. This Court concludes that, because the Idaho Supreme Court sua sponte considered Severson's claim on federal grounds, it is properly exhausted and subject to AEDPA deferential review.

In *Schad*, the Supreme Court explained that certain criminal settings require a more detailed juror unanimity instruction. The *Schad* court analogized to the "long-established rule of the criminal law that an indictment need not specify which overt act, among several named, was the means by which a crime was committed." 501 U.S. at 631. Due process is concerned about the elements of a crime, rather than simply the means of a crime. *Id*. at 638. Importantly, the *Schad* court concluded that the distinction between what "'fact[s] [are] necessary to constitute the crime,' and therefore must be proved individually, and what facts are mere means, represent value choices more appropriately made in the first instance by a legislature than by a court." *Id*. at 638 (citing *In re Winship*, 397 U.S. 358, 364 (1970)). Therefore, unless the unanimity question focuses distinctly on elements of a crime, due process is not implicated.

In general, the Due Process Clause prohibits the State from defining a crime in a manner so vague as to "permit[ ] a defendant's conviction without jury agreement as to which course [of conduct] or state [of mind] actually occurred." *Id*. at 632. The *Schad*

---

Petitioner committed the crime of murder. In any event, *Ramos* is not retroactively applicable. *Edwards v. Vannoy*, 141 S. Ct. 1547 (2021).

**MEMORANDUM DECISION AND ORDER - 26**

court gave an example of a criminal charge that would violate a defendant's due process rights: "nothing in our history suggests that the Due Process Clause would permit a State to convict anyone under a charge of 'Crime' so generic that any combination of jury findings of embezzlement, reckless driving, murder, burglary, tax evasion, or littering, for example, would suffice for conviction." *Id*. at 633.

Applying due process principles gleaned from *Schad* and other cases, the Idaho Supreme Court analyzed and rejected the federal due process issue in Severson's case:

> The trial court in this case was not required to instruct the jury that it must unanimously agree on the means by which Severson killed his wife in order to find him guilty of murder. Such an instruction would not have been "correct and pertinent" under section 19–2132 because it was not supported by the facts of the case. Severson was charged with the single act of murdering his wife. The evidence presented at trial did not allege that he engaged in the conduct giving rise to the offense on more than one occasion. Although the evidence showed that Severson could have murdered his wife by either overdosing her or suffocating her, it did not indicate that separate incidents involving distinct unions of mens rea and actus reus occurred. The very nature of the crime of murder eliminates this possibility. Absent evidence of more than one instance in which Severson engaged in the charged conduct, the jury was not required to unanimously agree on the facts giving rise to the offense. *See Gain*, 140 Idaho at 174, 90 P.3d at 924 (concluding that a specific unanimity instruction was not required where the State presented evidence of one incident that served as the basis for all three counts the defendant was charged with). The jury could have found Severson guilty of murdering his wife by overdosing her, suffocating her, or both. Because there was no risk that Severson could be convicted of the single act of murdering Mary on more than one occasion, the trial court did not err by not giving a specific unanimity instruction to the jury.

**MEMORANDUM DECISION AND ORDER - 27**

State's Lodging B-8, p. 19.

Severson argues that *Schad* does not apply because his argument is not about a jury's decision as to guilt. Instead, Severson explains, his argument is "that when the state gives the jury several different and distinct criminal acts committed over an extended period of time as to one single charged crime, the jury must unanimously agree on one single criminal act constituting the crime charged." Dkt. 72, p. 6. He argues that the State should not be permitted to add the words "and/or" or "or" in the disjunctive, which allegedly improperly allows the jury to choose from any of the alleged criminal acts. *Id*.

The Idaho Supreme Court's analysis is a reasonable and correct application of federal due process precedent. Due process does not require the more particular unanimity jury instruction requested by Severson. There is no evidence in the record showing that the acts occurred over "an extended period of time." Severson and Mary celebrated Valentine's Day by going out to dinner on February 14, and, by the early morning hours of February 15, Mary was dead. *See* State's Lodgings A-16, pp. 1655-1656; A-17, pp. 2801-2802. The State presented evidence and argued that Severson unsuccessfully attempted to kill Mary several different ways by several different means over several months before he succeeded, but he was not charged with attempted murder for these acts, but only the actual murder occurring between the evening of February 14 and the early morning hours of February 15. Because there was only one charged crime,

**MEMORANDUM DECISION AND ORDER - 28**

committed by sleep medication poisoning, suffocation, or both, the instruction given satisfied the United States Constitution.

For the reasons set forth above, the Court concludes that Claim 3 is not procedurally defaulted but is subject to denial on the merits, regardless of whether AEDPA deferential review or de novo review is applied.

**4. Discussion of Claim 4: Sufficiency of Evidence**

Claim 4 is that there was "insufficient evidence to prove beyond a reasonable doubt that Mary Severson's death was caused by [the] criminal agency of another." Dkt. 1, p. 16. In particular, Severson argues that the mere possibility that Mary died from overdosing and/or suffocation, without any evidence showing any criminal acts on the part of Mr. Severson, is not sufficient to prove beyond a reasonable doubt that Severson committed murder. Dkt. 1, p. 28.

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship,* 397 U.S. at 364. Evidence supporting a conviction is constitutionally sufficient if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Severson presented this claim in *Severson I*. State's Lodging B-5, pp. 51-63. The Idaho Supreme Court correctly identified the federal standard of law, stating that it "will

**MEMORANDUM DECISION AND ORDER - 29**

uphold a judgment of conviction entered upon a jury verdict so long as there is substantial evidence upon which a rational trier of fact could conclude that the prosecution proved all essential elements of the crime beyond a reasonable doubt." State's Lodging B-8, p. 20. To support its conclusion, the Idaho Supreme Court pointed to an enormous amount of evidence showing that Severson "willfully, deliberately, and with malice aforethought and premeditation, killed Mary by overdosing her, suffocating her, or both, and that Mary's death was caused by a criminal act" of Severson. *Id*. The Idaho Supreme Court found the evidence showed that Severson had a motive to kill his wife, was preparing people for her death, had recently tried to poison her, had the opportunity and means to kill her, and had tried to conceal the circumstances surrounding her death, based on the following particulars:

- The autopsy performed by Dr. Glenn Groben revealed that Mary had lethal levels of Unisom and toxic levels of Ambien in her system.

- Mary's autopsy revealed that there were bruises and abrasions on her face and cuts on the inside of her lip. According to Dr. Groben, the State's expert, the marks were inconsistent with resuscitative efforts, but could have been caused by being suffocated by someone's hand.

- The evidence revealed that it was unlikely that Mary's overdose was self-imposed.

- No evidence was presented indicating Mary died from natural causes.

- The evidence presented at trial revealed that Severson had both financial and personal incentives to kill Mary. Before Mary died, she informed Severson that if he insisted on divorcing her, she would get everything and would request $3,000 per month in alimony. Severson then repeatedly told people that he

**MEMORANDUM DECISION AND ORDER - 30**

wanted to divorce Mary but could not afford to because all the couple's assets were in her name. Additionally, Severson thought he was the beneficiary of Mary's $200,000 life insurance policy. Severson began looking into the policy the day Mary died. In a conversation with his son, Severson indicated that he needed to look at the policy because Mary's mother had called and asked about it. However, Mary's mother testified that she did not ask Severson about the policy until the next day and that, when she did ask about it, Severson denied its existence.

- Severson's motive to kill Mary was supported by evidence that the Seversons were having marital problems and that Severson was pursuing other women. Severson became engaged to another woman while still married to Mary and then started dating another woman immediately after Mary's death.

- There was also evidence indicating that Severson had been planning Mary's death. Shortly after Mary returned to Idaho, Severson began poisoning Mary's Hydroxycut with Drano. When Mary first started suffering from stomach problems relating to the contaminated Hydroxycut, Severson began telling people that she was dying, but that Mary's doctor did not want her to find out. He also told people that Mary was suffering from sleep apnea, which causes people to stop breathing in their sleep. However, Mary was never treated for, and never reported suffering from, sleep apnea. Additionally, the emergency room physician who tried to resuscitate Mary testified that the "sleep apnea" symptoms Severson reported Mary allegedly suffered from did not fit any illness with which she was familiar.

- Severson attempted to conceal the circumstances surrounding Mary's death. Severson did not call 911 after he "found" Mary lying on the couch not breathing. Instead, his daughter-in-law made the call after she arrived at Severson's home and realized that he had not called an ambulance.

- After Mary died, Severson tried to hide the fact that she had been taking sleeping pills. When asked at the hospital what medications Mary had been taking, Severson failed to mention that she was taking Ambien even though he requested and picked up a refill of the medication for her the day before. He also told his daughter-in-law that Mary had not been taking anything to help

**MEMORANDUM DECISION AND ORDER - 31**

her sleep[6]. Then, during the search of Severson's home, investigators found a baggie of Unisom pills hidden in the brim of a hat with the word "dad" printed on it.

- Severson was the only person besides Mary in the couple's home that night. He had access to Mary's sleeping pills and the means to suffocate her.

State's Lodging B-8, pp. 21-24.

This Court concludes that Severson has not shown that the Idaho Supreme Court's rejection of this claim was based on an unreasonable application of United States Supreme Court precedent, because sufficient evidence supported each element of the crime of first degree murder. Nor has Severson shown that the decision is based on an unreasonable determination of the facts. To the contrary, overwhelming circumstantial evidence supports a conclusion that the jury verdict on the murder count could have been based on poisoning and/or suffocation, which are not elements of the crime, but only means of committing a crime. Under either an AEDPA deference or a de novo review standard, Claim 4 is subject to denial and will be dismissed with prejudice.

### 5. Discussion of Claim 5: Multiple Acts of Alleged Prosecutorial Misconduct

In Claim 5, Severson alleges he was denied his constitutional right to a fair trial due to "serious and relentless acts of prosecutorial misconduct." Dkt. 1, pp. 16, 32. He

---

[6] Emergency room physician, Dr. Diana Binnion, testified that Severson told her Mary was on a "Fat Burner" medication and Paxil, but nothing else. State's Lodging A-16, p. 1097. Similarly, even though Severson had picked up an Ambien prescription for Mary the day before her death, he denied that Mary was on a sleeping medication when asked by his daughter in law, Nora Rutherford, at the time Nora was trying to gather Mary's medications to comply with instructions from the paramedics. *Id.*, pp. 1173-1174.

presented these claims to the Idaho Supreme Court on direct review. State's Lodging B-5, pp. 63-89.

The standard for a claim of prosecutorial misconduct on habeas review is a "narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). Prosecutors have a "duty to refrain from improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935).

With regard to a prosecutor's arguments to the jury, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden*, 477 U.S. at 181. Rather, "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

Courts "must consider the probable effect the prosecutor's [comments] would have on the jury's ability to judge the evidence fairly," and, where the prosecutor is attempting to respond to the defense, a court must also consider "defense counsel's conduct, as well as the nature of the prosecutor's response." *United States v. Young*, 470 U.S. 1, 12 (1985). Inappropriate comments "must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error." *Id*. at 5; *see Darden*, 477 U.S. at 182 (finding that"[m]uch of the objectionable content was invited by or was responsive to the opening summation of the defense").

**MEMORANDUM DECISION AND ORDER - 33**

Inappropriate comments may or may not cross the line to constitute prosecutorial misconduct. If the prosecutor's remarks "prejudiced a specific right, such as the privilege against compulsory self-incrimination, as to amount to a denial of that right," the remarks are considered misconduct and the analysis of the misconduct must include case law governing the particular constitutional provision governing that right. *See Donnelly*, 416 U.S. at 643.

Comments that may amount to misconduct include attempts to "manipulate or misstate the evidence." *Darden,* 477 U.S. at 182. But prosecutorial comments that do not implicate a specific Bill of Rights protection are not classified as misconduct unless the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 181 (citing *Donnelly*, 416 U.S. at 642).

On habeas corpus review, *all* prosecutorial misconduct claims are subject to harmless error analysis, and relief is warranted only if the alleged error "had substantial and injurious effect or influence in determining the jury's verdict" under *Brecht v. Abrahamson.* 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

When reviewing prosecutorial misconduct claims under the "unreasonable application" prong of § 2254(d)(1), the Court must keep in mind that the standard is a "very general one," which affords state courts "more leeway, in reaching outcomes in

case-by-case determinations." *Matthews*, 567 U.S. at 48 (internal quotation marks and alterations omitted).

### Claim 5.1 – Alleged Misconduct by Late Evidentiary Disclosures

i. 5.1(a) Witnesses

Claim 5.1 is that the prosecutor committed misconduct by failing to disclose the identities of fourteen potential witnesses until after jury selection began. Dkt. 1, pp. 33-34. The trial court ruled that twelve of the witnesses were foundational witnesses (institutional witnesses, some of which had not been named yet), or witnesses the defense could have discovered on their own. To remedy the late disclosure of the other two witnesses, attorney Phil Miller, and his secretary, Tammy Mallea, the trial court ordered that the defense be given the opportunity to meet with the witnesses, that the State disclose the witnesses' testimony, and that the defense be permitted to make additional argument, if necessary, after meeting with the witnesses. State's Lodgings A-14, pp. 72-81; B-8, p. 34.

On these facts, the Idaho Supreme Court determined the State's "late disclosure of witnesses was not prosecutorial misconduct." State's Lodging B-8, p. 34. The Idaho Supreme Court found "[t]he record shows that the late disclosures were inadvertent" and that the prosecution took "prompt action to provide the information to the defense once the mistakes were brought to its attention." State's Lodgings B-8, p. 34 n. 36; A-14, pp. 75-103. Most importantly, "Severson failed to demonstrate that the late disclosures

**MEMORANDUM DECISION AND ORDER - 35**

resulted in prejudice." State's Lodging B-8, p. 34. Finally, the Idaho Supreme Court found that, "[e]ven if Severson had alleged that the late disclosures resulted in prejudice, the remedial actions taken by the district court would have likely cured any adverse effects." State's Lodging B-8, p. 34.

Here, Respondent points to the fact that Severson did not show that any of the named witnesses discussed by the parties at the hearing actually testified at trial. *See* State's Lodging A-16, Index pp. 8-12 (showing that foundational witnesses Ms. Van Dorn and Ms. Martinez, and substantive witnesses Phill Miller and Tammy Mallea, did not testify at trial).[7]

The record does not contain facts showing that the prosecutor intentionally withheld the identities of these witnesses from Severson, and the record reflects that the omissions were promptly remedied and the witnesses did not testify at the trial. Severson did not raise in state court, nor does he raise here, any instance of prejudice resulting to his defense, as a result of the late disclosure of these witnesses. Accordingly, the Idaho Supreme Court's opinion is a reasonable application of governing United States Supreme Court precedent, and this claim will be denied on the merits under AEDPA.

---

[7] Teresa Mallea, an Elmore County dispatcher testified, not to be confused with Tammy Mallea, a legal secretary, who did not. See State's Lodging A-16, p. 955, *et seq*.

**MEMORANDUM DECISION AND ORDER - 36**

ii.  5.1(b) Exhibits

Severson also alleges that the prosecution committed misconduct when it failed to disclose two categories of evidence to him until the midst of trial. Dkt. 1, pp. 34-35. Severson raised this claim in *Severson I*. State's Lodging B-5, pp. 67-71.

### a.  Calibration of Equipment

During trial, Mr. Frachiseur told the court that the defense's toxicology expert reported that the State had not produced documentation regarding the testing and calibration of equipment in the "laboratory litigation packet" of the State's toxicologist. State's Lodging A-17, p. 1953. This evidence concerned the testing done on Mary's blood and gastric contents. *Id*. at 1956. The prosecutor responded that he had provided everything the State's toxicologist had provided to the prosecution, but that he could inquire further about the "missing" items. *Id*., p. 1955. Mr. Frachiseur produced "a rough draft" list of the missing items. The prosecutor agreed to make phone calls to the laboratory and request that they "FedEx" anything they possessed that was on the list. *Id*., p. 1958. Later, Mr. Frachiseur reported to the Court that the prosecutor did have the additional documentation in its possession, but a staff member at the prosecutor's office "simply didn't get it all over to us," and that the defense "now have been served with the balance of that." *Id*., p. 2028.

The Idaho Supreme Court found that, "with regard to the late disclosure of portions of the laboratory packet, the record shows that once the prosecution realized the

packet was missing information, it took efforts to obtain the information and provide it to the defense." State's Lodging B-8, p. 28 n. 30; A-17, pp. 1954-1959. The prosecutor "delivered the information in time for Severson to have it examined by his own toxicologist." State's Lodgings B-8, p. 28 n. 3; A-17, p. 2028. Mr. Frachiseur confirmed they had the "full packet" from the laboratory, and that he had "no problem" with the State proceeding with direct examination of its toxicology expert. *Id.*, pp. 2282-2283.

In addition, Severson did not identify any prejudice that occurred as a result of the late disclosures that either went to the foundation of Severson's case or had an adverse impact on the fairness of his trial. Therefore, the Idaho Supreme Court found that "the late disclosures were not fundamental error." State's Lodging B-8, p. 28 (footnote omitted).

As a prerequisite to determining this claim, this Court agrees with Respondent's reasoning that Idaho's fundamental error standard is essentially the same as the federal due process standard set forth in *Darden*, 477 U.S. at 181 (stating that the standard is whether the comments deprived the defendant of a fair trial), and *Donnelly*, 416 U.S. at 643 (stating that the standard is whether the prosecutor's remark "infected the trial with unfairness as to make the resulting conviction a denial of due process").

Here, based on a review of the record and the lack of any showing of prejudice from the late disclosure of the foundational information supporting the State's toxicology laboratory results, the Court concludes that the Idaho Supreme Court's decision was not

**MEMORANDUM DECISION AND ORDER - 38**

an unreasonable application of United States Supreme Court precedent. This claim will be denied on the merits under AEDPA's deferential standard.

### b. FDA Notes

Severson complains that the State belatedly turned over investigation notes prepared by the Food and Drug Administration (FDA), termed "Jencks materials." State's Lodging B-17, p. 70-71. Severson raised this claim in *Severson I*. *Id*.

The Idaho Supreme Court acknowledged that late disclosures of discovery can constitute misconduct, but it found that Severson "nonetheless failed to show that the late disclosures constituted fundamental error" because they had no "adverse impact on the fairness of Severson's trial." State's Lodging B-8, p. 28 (footnote omitted).

The record reflects that this finding and conclusion are true: Severson identified no prejudice resulting from the late disclosure. His appellate brief simply stated: "the untimely disclosed witnesses and repeated late discovery violations are a factor that this Court should consider, along with all other prosecutorial misconduct in the case, which amounted to a violation of Mr. Severson's right to a fair trial." State's Lodging B-5, p. 71.

The Idaho Supreme Court's analysis focused on determining whether the late disclosure had an adverse impact on the trial meets the due process tests of *Darden* and *Donnelly*. Therefore, the Court concludes that the Idaho Supreme Court's decision is not

**MEMORANDUM DECISION AND ORDER - 39**

an unreasonable application of United States Supreme Court precedent. Therefore,

AEDPA deference is appropriate, and this claim will be denied.

### A. Claim 5.2 – Alleged Misconduct in Witness Discussions

Claim 5.2 is that the prosecutor committed misconduct when, "[i]n direct violation

of the [trial] court's order," he "met with Dr. Groben during a lunch break." Dkt. 1, p. 35.

During trial, Judge Wetherell ordered that, during the course of a witness's testimony,

counsel were not allowed to confer with the witness about their testimony during any

recesses. State's Lodging A-16, pp. 1057-1058. The purpose of the ruling was to prevent

coaching of the witness. *Id*., p. 295.

In an in camera examination, Mr. Frachiseur asked Dr. Groben what he discussed

with Mr. Bazzoli at their lunch, which occurred after direct examination, but before

cross-examination. Dr. Groben clarified that he discussed "[g]eneralities of the case,"

meaning "things we have talked about multiple times before coming in here" with the

prosecutor during lunch. State's Lodging A-16, pp. 1330-1332. Dr. Groben denied that

they had any discussions about "the anticipated cross-examination," other than how long

Dr. Groben would be on the stand. *Id*., p. 1331.

Dr. Groben specifically denied discussing "any areas of testimony that [he]

subsequently concluded were erroneous" or discussing whether he "had made any

mistake." *Id*. Dr. Groben testified that he met with the prosecutors "all the time" to

**MEMORANDUM DECISION AND ORDER - 40**

prepare for trial, and the lunch meeting was "less, it was just lunch, general topics." *Id.* at 1333.

Based on that explanation, the trial court concluded that the lunch meeting did not violate its order: "it does not appear there was any improper discussion of testimony between the witness and the Prosecution at lunch." State's Lodging A-16, p. 1333. In addition, the court ruled that defense counsel could question Dr. Groben about the lunch meeting in the presence of the jury. *Id.* at 364.

On appeal, the Idaho Supreme Court found that the trial court properly concluded that the conversation was not improper. The Idaho Supreme Court concluded that, because the discussion at the lunchtime meeting "did not go to the foundation of Severson's case or implicate any of his constitutional rights," Severson's "bare assertion" of prejudice did not "fulfill his burden of establishing fundamental error." State's Lodging B-8, p. 27.

Severson has not explained how the prosecutor's lunch with Dr. Groben affected his defense or the trial. After asking several questions outside the jury's presence, Mr. Frachiseur was satisfied that no impropriety occurred during the lunch conversation that would prejudice the defense. State's Lodging A-16, pp. 1330-1333. Because there is no evidence in the record to show that the conversation prejudiced the defense, this Court concludes that the Idaho Supreme Court's decision was not contrary to United States Supreme Court precedent. This claim is subject to denial under AEDPA.

**MEMORANDUM DECISION AND ORDER - 41**

### B.  *Claim 5.3 – Alleged Misconduct During Witness Examination*

Claim 5.3 is that the prosecutor improperly engaged in "speaking objections," in violation of the trial court's order to refrain from objecting in a manner that would suggest inadmissible evidence to the jury. Dkt. 1, pp. 36-37. Most of Severson's claims center on the prosecutor's answers to questions that the judge asked after defense counsel had objected. Severson also claims that the prosecutor "improperly … asked questions it knew would be objected to and sustained" and in doing so "sought the introduction of clearly inadmissible evidence." *Id.*, p. 37.

The *American Law Reports* treatise explains the potential prejudices that may arise from improper questions:

> They may plainly convey information excluded by the rules of evidence; may hint at the existence of significant though inadmissible facts, with or without a suggestion as to their exact nature; may, by the assumptions therein contained, and notwithstanding the answers being prevented, impress upon the jury, by a mere show of proof, matters which are not admissible in evidence and which perhaps could not be proved, as inferred, even if opportunity were afforded; and may, by reason of the objections made, emphasize the facts suggested more effectively than might be done by answers admitted without objection.

109 A.L.R. 1089 (Originally published in 1937; updated weekly online) (footnotes omitted).

MEMORANDUM DECISION AND ORDER - 42

i.   Examination of Detective Wolfe

**a.  Photographs**

During direct examination, Mr. Howen, the attorney general prosecutor, asked

Detective Wolfe how she knew that two photographs did not depict how the items in the

photographs were initially found. State's Lodging A-16, pp. 1552-1554. Detective Wolfe

answered that Deputy Sterling told her that information; defense counsel objected on

hearsay grounds. Judge Wetherell sustained the objection, and Mr. Howen attempted to

ask the question differently, drawing the same objection. The judge then said, "I can't

think of any way that is not hearsay. Can you tell me how?" State's Lodging A-16, pp.

1552-1553.

In response, the prosecutor explained why he believed the testimony was for

impeachment based on a prior inconsistent statement of another officer, and not for the

truth of the matter stated. State's Lodging A-16, pp. 1552-1554. The trial court still

disagreed, and sustained the objection. *Id.* Severson asserts that this explanation, solicited

by the judge, violated the district court's injunction that speaking objections were not

permitted during trial. *See* State's Lodging A-16, p. 941.

The Idaho Supreme Court rejected this claim on the merits. State's Lodging B-8,

p. 29. It found that Severson "failed to indicate how" the prosecutor's "statement resulted

in an unfair trial or deprived him of any other fundamental right." *Id.* "Moreover," the

Court found, "in responding to the objection, the prosecutor was not attempting to

deliberately violate the court's order. Instead, the prosecutor was merely trying to explain his belief that the statement qualified as a hearsay exception." *Id*.

This Court agrees with Respondent that it is difficult to understand how the prosecutor's direct response to court questioning could be construed as intentional disobedience to the court order. Moreover, this Court concludes, as did the Idaho Supreme Court, that Severson has not shown that the prosecutor's comments in support of his examination question and in answer to the judge's question had any effect on the trial or Severson's due process rights. In particular, the prosecutor was not attempting to solicit inadmissible evidence, because he could have called Deputy Sterling himself to testify about what he told Detective Wolf, and then it would not have been hearsay. In other words, the information was not harmful because it was inadmissible; it was simply elicited from the wrong witness.

Nothing in the record shows that this discussion amounted to prosecutorial misconduct or that it prejudiced Severson's defense. The Idaho Supreme Court's decision that the prosecutor's answer to the judge's question was not prosecutorial misconduct is a reasonable application of due process precedent, and federal habeas corpus relief is not warranted on AEDPA review.

### b. Receipts

During cross-examination, defense counsel asked Detective Wolfe about why combustible receipts from Zales, Baymont Inn, and Hearthstone Lodge (all related to

**MEMORANDUM DECISION AND ORDER - 44**

Severson's affair with Jennifer Watkins) would have been placed in a fireplace, where they were found by investigators. On re-direct, the prosecutor asked Detective Wolfe if she had placed the receipts there, to which Detective Wolfe responded "No, sir." The prosecutor then asked: "If you could have the opportunity would you ask Mary Severson why she placed [those papers in the fireplace]?" State's Lodging A-17, p. 2496. Defense counsel objected to this follow-up question, and the objection was sustained. *Id*.

Severson contends the follow-up question was "clearly improper," "highly prejudicial," meant "to play on the passions and sympathies of the jury," and "insinuated wrong doing" on his part. Dkt. 1, p. 40. The Idaho Supreme Court found that Severson did not indicate why he asserted that the question was "clearly improper." State's Lodging B-8, p. 36. The court concluded that Severson "failed to meet his burden of proof to show how the question resulted in prejudice to his case." *Id*.

Severson likely contended that the question was improper because defense counsel's objection to the question was sustained. State's Lodging A-17, p. 2496. The question also appears meant to convey an improper message to the jury, because, on its face, it is nonsensical, as investigators cannot ask deceased persons questions. But the more pointed issue here is whether the impropriety crossed the line to misconduct because it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. The particular question at issue

**MEMORANDUM DECISION AND ORDER - 45**

showed little more than the prosecutor was posing a nonsensical question to emphasize the fact of the affair. But jurors already knew that Severson was having an affair.

Though inappropriate, the odd question did not raise any inadmissible facts, was not a misstatement of evidence, and was not any more inflammatory that the known fact that Severson was having an affair. Consequently, the question does not rise to the level of misconduct because it did not infect the trial with unfairness so as to make the resulting conviction a denial of due process. Therefore, the Idaho Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established due process law. This claim will be denied under AEDPA's deferential review standard.

### ii.  Examination of David Bourne

Severson asserts that the prosecutor committed misconduct during direct examination of David Bourne, an FDA special agent, who was testifying about federal jurisdiction over product-tampering crimes. Dkt. 1, pp. 37- 38. Here, again, the judge asked the prosecutor a question, the prosecutor answered the question, and Severson challenges the prosecutor's response. Dkt. 1, pp. 37-38. That colloquy was as follows:

> Q. [from the prosecutor to David Bourne]: Now, based on [an interview with Severson], why did you not make a recommendation for any prosecution to the United States Attorney's Office?
>
> [Defense counsel]: Your Honor, I object as being irrelevant.

**MEMORANDUM DECISION AND ORDER - 46**

THE COURT: Advise me of the relevancy of the question, Mr. Howen.

[Prosecutor]: It would be his investigative jurisdiction if this matter was not tampered with anywhere but the end of the consumer line.

[Defense counsel]: And I object to that.

THE COURT: Do you want to discuss this matter outside the presence of the jury? Because the Court does.

State's Lodging A-17, p. 2353.

The jury was excused, at which point the trial court "admonish[ed]" the prosecutor: "[W]hen I ask for an explanation, I don't expect you to testify for the witness." *Id*., p. 2354. Clearly surprised, the prosecutor responded, "[w]hen you ask me for an explanation, what did you want me to say?" The trial court explained that it did not want the prosecutor to recite "what the witness was going to testify to" and that any evidence proffer should be taken up "out of the presence of the jury." *Id*., pp. 2356-2357.

Defense counsel then asked the trial court to give "an admonishment to the jury," which the court did. The court told the jury that, "just prior to the recess" the prosecutor "described what he believed the witness's testimony would be," and that the court is "admonishing you that statements by counsel are not evidence," and that jurors were "to disregard any comments made by State's counsel as to what he believed the evidence would be." *Id*., pp. 2359-2360.

**MEMORANDUM DECISION AND ORDER - 47**

Severson claims that the prosecutor's response to the judge's question improperly suggested an inadmissible fact to the jury. But, in context, the judge asked the question in the presence of the jury, rather than taking a recess. Even though the judge later gave the prosecutor an example of how he expected the prosecutor to answer a question—in a vague manner to avoid saying what the witness might say—it would be difficult for any attorney to think through that analysis successfully in a split second to decide whether to ask for a recess before answering a question; it is simply human nature to answer a question when asked of a judge.

The Idaho Supreme Court probed whether the prosecutor's answer was improper and prejudicial:

> Severson has not alleged that the prosecutor knew the answers to the above questions were inadmissible. Similarly, he has not indicated what impermissible answers the jury might infer from the questions or statements. While the statement that the FDA would have had jurisdiction if the tampering had not occurred at the end of the consumer line implies the consumer was responsible for the contaminated Hydroxycut, it in no way indicated Severson was responsible for the tampering. Even if it had, there was other evidence linking Severson to the contamination. Additionally, Severson has not articulated how the objections resulted in prejudice or why the curative instructions given to the jury were inadequate to remedy any prejudice the statements may have created. Because the prosecutor's speaking objections did not constitute prosecutorial misconduct, they did not deprive Severson of his right to a fair trial.

State's Lodging B-8 p. 35.

This Court concludes that the Idaho Supreme Court's decision is not contrary to, or an unreasonable application of federal due process law. As explained previously, various types of evidence admitted at trial showed that Severson had been cutting open Mary's pills and inserting Drano. Therefore, this question about whether the FDA investigator had jurisdiction over pill tampering that occurred at the consumer level, suggesting that Severson was tampering with Mary's pills, would not have had more effect on the jury than the other evidence showing Severson's efforts to poison Mary. No prejudice has been shown here. The Court will deny this claim on the merits under AEDPA's deferential standard.

### iii. Examination of Randall Valley

#### a. Life insurance policy

Severson also asserts that the prosecutor suggested an inadmissible answer to the jury on redirect examination of a witness testifying about Mary's and Severson's life insurance policies.

On cross-examination by defense counsel, witness Randall Valley, an employee of the life insurance company, indicated that he was not aware of any request to increase Mary's coverage and normally would know if such a request had been made. State's Lodging A-17, p. 3454. On redirect, the prosecutor asked the witness, "I take it there are some things you probably should be notified of and you are not notified of and do not have personal knowledge of to the last question Counsel asked you?" *Id*. Valley

**MEMORANDUM DECISION AND ORDER - 49**

responded: My response was, is I—if that happened I should have been notified but I can never ensure that I was." *Id*., pp. 3454-55. No objection was made at this point.

The trial court later specifically instructed the jury that "there is no evidence in this case that Larry Severson or any other party requested an increase in the amount of life insurance coverage in [existence] on the life of Mary Severson." State's Lodging A-9, p. 1700 (Instruction no. 39).

Severson asserts that the question was improper because the prosecutor knew Mary's life insurance coverage had not been increased, but nonetheless tried to imply to the jury that Severson had tried to increase it. Severson argues that this was prosecutorial misconduct because the prosecutor was knowingly attempting to offer false evidence. State's Lodging B-8, pp. 35-36.

On direct appeal, the Idaho Supreme Court concluded that the question "was not an attempt to offer false evidence." State's Lodging B-8, p. 36. The Court reasoned:

> The record indicates that the prosecutor was merely clarifying defense counsel's prior line of questioning and trying to establish the witness's basis of knowledge. Although the question may have implied that the witness might not know if Mary's coverage had been increased, it did not rise to the level of presenting false evidence. Defense counsel opened up the door to the questioning by asking the witness whether he would know if the coverage had been increased. Moreover, any prejudice that may have resulted from the question was cured by the trial court's instructions to the jury that the prosecutor's statement was not evidence and that there was no evidence Severson had requested an increase in Mary's life insurance coverage.

**MEMORANDUM DECISION AND ORDER - 50**

*Id*.

In *Young*, the United States Supreme Court addressed prosecutorial comments generated in response to defense actions. The *Young* court advised that courts should consider whether defense counsel "invited" the error, and the courts "must consider the probable effect the prosecutor's [comments] would have on the jury's ability to judge the evidence fairly." *Id*. In addition, in *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987), the Court recognized that curative instructions will generally cure error except in rare circumstances.

Here, because the trial evidence established Severson had not requested a life insurance increase, and the jury was expressly instructed there was no such evidence. Severson fails to show that any prejudice resulted from the vague question and its equally vague response. Severson has not shown that this colloquy "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. Hence, this Court concludes that the Idaho Supreme Court's decision on this claim is not contrary to, or an unreasonable application of, United States Supreme Court precedent. Habeas corpus relief under AEDPA is not warranted.

### b. Cancer

Severson argues that the prosecutor made a second improper comment on the evidence while questioning Mr. Valley. Dkt. 1, p. 38. On appeal the Idaho Supreme Court summarized that claim as follows: "[T]he prosecution asked [Mr. Valley] how he

responded when he learned from an acquaintance [ Mr. Bock] that Severson had said

Mary was dying of cancer, but that her doctor did not want her to know." State's Lodging

A-17, p. 3423; *see also* State's Lodging A-17, pp. 2909-2910. When the defense objected

on grounds of relevance, the prosecutor argued that it was relevant "[t]o express [Mr.

Valley's] lack of belief in what the defendant had told [Mr. Bock]." *Id.*, p. 3424. After the

prosecutor responded, the trial court excused the jury and ruled that the question was

irrelevant. *Id.*, p. 3429.

The court told the prosecutor that if he intended to respond to objections by

indicating what the witness would testify to, he should ask the court to excuse the jury.

*Id.*, pp. 3430-3431. The prosecutor then told the judge that he thought Mr. Frachiseur had

been making speaking objections throughout the past three or four weeks of trial, and that

the judge seemed to be permitting the defense to make speaking objections, but not the

prosecution. *Id.*, pp. 3434-3436. The judge responded that he had admonished Mr.

Frachiseur several times about not making speaking objections. The judge said he

thought he was being "equally vigilant" on both sides, but he would "do his best to be

sure that he [was]." *Id.*, p. 3436. The judge then thanked the prosecutor for his comments

about equal application of the order against speaking objections. *Id*.

After this conversation, the jury returned, and the court gave a limiting instruction

reminding jurors that statements made by counsel were not to be regarded as evidence.

*Id.*, pp. 3436-3437. State's Lodging B-8, pp. 34-35.

**MEMORANDUM DECISION AND ORDER - 52**

Severson has not shown how the question or the suggested answer affected his due process rights. Steven Bock testified that Severson said Mary's doctor had told Severson that Mary was dying from stomach cancer, but that Mary's doctor had not told Mary that news and instructed Severson not to tell her. State's Lodging A-17, pp. 2909-2910. Thus, the jury already had knew this information. Given the strength of the evidence in this case, it is unlikely that the jury was influenced by what Mr. Valley thought about what Severson told Mr. Bock. In addition, the prosecutor's discussion with the judge about being even-handed with speaking objection admonitions suggests that both attorneys were having difficulty with the judge's style of discussing objections in front of the jury.

The Idaho Supreme Court determined that Severson did not show that the prosecutor knew the answer to his question would be deemed irrelevant, and that Severson "has not indicated what impermissible answers the jury might infer from the questions or statements." State's Lodging B-5, p. 35.

Nothing in the record shows that the question to Mr. Valley "so infected the trial with unfairness as to make the resulting conviction a denial of due process," *Donnelly*, 416 U.S. at 643, especially given that the jury heard the content of the original conversation in Mr. Bock's testimony and had to decide for themselves whether it was unbelievable. As a result, the Idaho Supreme Court reasonably determined that the prosecutor's statement did not amount to prosecutorial misconduct. This claim will be denied under AEPDA's deferential review standard.

**MEMORANDUM DECISION AND ORDER - 53**

### C.  Claim 5.4 – Closing Argument Comment On Silence

Claim 5.4 is that the prosecutor violated Severson's Fifth Amendment right by commenting on his silence as evidence of guilt. Dkt. 1, p. 41. In rebuttal closing argument, the prosecutor stated: "This is a circumstantial case, because nobody was in that house that night but Mary and Larry. Nobody knows, that has testified, what happened between them." State's Lodging A-17, p. 4133. Severson raised this claim in *Severson I*. State's Lodging B-5, pp. 82-84.

It is clearly established that the Fifth Amendment prohibits a prosecutor from commenting on a defendant's exercise of his right to remain silent for the purpose of implying guilt. *Griffin v. California*, 380 U.S. 609, 614 (1965). The prosecution is not permitted to "use at trial the fact that [the defendant] stood mute or claimed his privilege in the face of accusation." *Miranda v. Arizona*, 384 U.S. 436, 468 n. 37 (1966). However, a court is not to "lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly*, 416 U.S. at 647.

The context must be considered when deciding whether it was reasonable for the Idaho Supreme Court to reject this claim. This prosecution rebuttal argument was made in response to defense counsel's closing argument that the State's case was just a theory that "is like a balloon, and an inconsistent known or established fact is like a pin. You put them together, the balloon pops and disappears." State's Lodging A-17, p. 4070. Mr.

**MEMORANDUM DECISION AND ORDER - 54**

Frachiseur argued: "Nobody said, "Here is why she died…. Not one person. After 50 witnesses, four experts, it's not there." *Id.*, p. 4077. He also argued: "Now the suffocation is a real problem. It is a real problem for the State because, if you consider the testimony of all the experts, you will find that none of them deny that some bruising is going to occur in the course of resuscitative efforts." *Id*.

Mr. Frachiseur proceeded to make a long, technical closing argument critically highlighting the scientific evidence that amounted to holes in the prosecution's case. Mr. Bazzoli had to respond and patch up the holes, immediately, without much time to think through his rebuttal argument.

The Idaho Supreme Court found that, when viewed in context, the prosecutor was not plainly commenting on Severson's exercise of his Fifth Amendment right. State's Lodging B-8, p. 30. The court observed that, while the prosecutor's statement "could be interpreted as a reference to Severson's failure to testify, it could also be accorded other meanings." State's Lodging B-8, p. 30. The most obvious other interpretation of the comment was that it referred to the *experts'* "inability to conclusively establish Mary's cause of death." *See id*. The prosecutor's rebuttal remarks in context were as follows:

> Mr. Frachiseur talked a lot about what went on that day, and "We don't know this, and we don't know that." He is right. I would love to talk to Mary Severson and find out, on the early-morning hours of February 15th, how she was feeling. How did the meal make her feel? How did it feel to go to dinner with her husband, and not be able to order the food

you want?"[8] He discussed that no one knew how many sleeping pills she took or why she took them.

I don't get to do that. I don't get to ask those questions. Nobody does. All we know is that according to Dr. Dawson, the State's expert in this case – I think a very credible individual, with nothing to lose in this matter—gave you a good answer as to how he figured out the totals."

…

The defense want you to believe that this was an accident, and that she [overdosed on Ambien and Unisom].

Let's talk about the defense's argument that these bruises were from resuscitation, and that's what all the experts said. That's what the ambulance guy said, he thinks it is from there. Even Dr. Groben [sic][9] says he has seen injuries to the mouth from resuscitative efforts, like broken teeth; like a bruised tongue; like a bruised throat. He has never seen symmetrical bruises across the canine teeth. He had never seen bruising across the chin like this. Even State's witness Dr. Gray [sic] said there is some bruising around the mouth, at times, that he has seen from his people, but isn't sure of necessarily the cause, and that this could be consistent with some other type of bruise. We are talking about science here; and [defense counsel's] note [in closing argument]—that he tore down—said, "Theory versus fact." Well, in the real life in this courtroom, the great leveler of society in here, theory and fact do work together. It is not a balloon, where one little microscopic pin breaks the whole balloon. This is a circumstantial case, because nobody was in that house that night but Mary and Larry. Nobody knows, that has testified, what happened between them.

---

[8] *See* State's Lodging A-17, p. 4125 (referring to the food server's testimony that Mary wanted to order cheese sticks and Larry didn't let her, *see id.*, p. 4019).

[9] The prosecutor misspoke. It was Dr. Grey who testified that he had seen injuries like broken teeth from resuscitative efforts. Dr. Groben denied ever seeing that. Compare State's Lodgings A-16, p. 1339 with A-17, p. 3023.

**MEMORANDUM DECISION AND ORDER - 56**

> It is the same if you hand your kid a chocolate bar and say, "Don't eat this." In a circumstantial case, you see the wrapper in the kitchen, you see chocolate on his shirt, on his hand. You didn't see anything. Nobody was in that room to tell you that he ate that chocolate. So the only thing you can do is deduce from logic what happened. This is a case about what is logical.

State's Lodging A-17, pp. 4132-4134.

In this context, a court reasonably applying *Strickland* could have come to the conclusion that the prosecutor was not highlighting Severson's failure to testify, but arguing that the witnesses who *did* testify provided sufficient circumstantial evidence pointing to Severson as the perpetrator.

The Idaho Supreme Court acknowledged the United States Supreme Court rule that ambiguous prosecutor comments that seem to refer to the defendant's silence should not automatically be accorded the most damaging meaning. After reviewing the context of the comments, the court was "unwilling to conclude that the prosecutor was [referring to] Severson's silence." State's Lodging B-8, p. 30. The record reasonably reflects that the prosecutor was specifically responding to Severson's claim that *all* expert testimony supported theories that Mary's bruises were caused by resuscitation efforts, not from suffocation. State's Lodging A-17, p. 4093. The phrase, "[n]obody knows, that has testified" naturally appears to a rebuttal argument asserting that all the experts who testified about the resuscitative-injury theory (that defense counsel just referred to) did

**MEMORANDUM DECISION AND ORDER - 57**

not actually know how the bruising happened, because they were not present upon Mary's death.

The Idaho Supreme Court also reasoned that nothing "in the statement explicitly called for the jury to infer Severson was guilty because of his silence or to convict him on that basis." *Id*. Instead, the court found, "[i]n all likelihood, given the ambiguous nature of the statement, the prosecutor did not even consider the interpretation Severson would attach to it." *Id*. This observation seems to ring true when one reviews Mr. Frachiseur's very convincing closing argument focused on the expert opinions. If not for the enormous amount of motive evidence and evidence of the Drano-laced Hydroxycut pills, Mr. Frauchiseur may have won the case for Severson with his expertise in pointing to reasonable doubt in the scientific evidence. The number of mistakes and improper statements Mr. Bazzoli made in the portion of the rebuttal quoted above shows that he was undoubtedly knocked off-balance by the strength of Mr. Frachiseur's closing argument.

When considering the *Darden* question of whether Severson received a fair trial in light of the ambiguous comment about "nobody who has testified knows what happened," the Idaho Supreme Court concluded: "since the statement was a single, isolated comment made during the course of a seventeen-day trial, there was substantial evidence of Severson's guilt, and the trial court instructed the jury not to draw negative inferences from Severson's failure to testify, the statement did not deprive Severson of

**MEMORANDUM DECISION AND ORDER - 58**

due process or render his trial fundamentally unfair." State's Lodgings B-8, p. 30; A-9, p. 1703 (Instruction no. 42).

This Court concludes that the Idaho Supreme Court's factfinding on this issue is supported by the record and, therefore, was not unreasonable. It is clearly established that "prosecutors' comments must be evaluated in light of the defense argument that preceded [them]." *Darden*, 477 U.S. at 179. Nothing in the context suggests that the prosecutor was talking about Severson's silence in the midst of a detailed rebuttal to a specific subject matter—that the testimony of *all* experts showed Mary's facial bruising was from resuscitation, not suffocation.

On the other hand, a defendant's right to remain silent is a fundamental right, and that is one of the factors upon which a court can rest to determine that the prosecutor committed prosecutorial misconduct. The comment, "Nobody knows, that has testified, what happened between them" can be construed to mean that the person *who knows the answer*—Severson—chose to remain silent. The dissenting opinion pointed out that the context can be viewed in favor of a constitutional violation:

> In context it is clear that the prosecutor was referring to the events that occurred between Mr. and Mrs. Severson on the night of Mrs. Severson's death. The prosecutor then clearly states that based on the fact that only two people were present, and one of them is dead, there is only one other person who has knowledge of the details which unfolded that fateful night, and that person did not testify. The meaning is anything but ambiguous and a blatant violation of Severson's constitutional right to remain silent.

**MEMORANDUM DECISION AND ORDER - 59**

State's Lodging B-8, p. 42 (Jones, J., dissenting).

However, the helpfulness of the dissent to Severson's federal habeas corpus argument ends there, because the dissenting opinion went on to disapprove of applying a harmless error analysis to procedural misconduct claims: "Allowing the harmless error doctrine to dismiss instances of blatant prosecutorial misconduct has effectively substituted our appellate court for the right to trial by jury." *Id*., p. 45. The point is well-taken when considering the outcome of the many prosecutorial misconduct claims Justice Jones recited in the recent history of Idaho appellate cases—that *no* relief to defendants has been granted since adoption of the harmless error rule. It is within Idaho's authority to craft a new state rule, as advocated by Justice Jones, but that is not relevant to federal law. To reject harmless error analysis on federal habeas corpus review would be contrary to United States Supreme Court precedent. [10]

This Court concludes that both the *Severson* majority and dissenting opinions are reasonable in their own right; however, the dissent is focused on an analysis of Idaho law that is not applicable here. This Court must rely on on-point United States Supreme Court

---

[10] The federal harmless error standard was wrought in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), a case that involved a prosecutor's repeated improper remarks to the jury concerning the defendant's pretrial silence, in violation of *Doyle v. Ohio*, 426 U.S. 610 (1976). *See id*. at 625–26. Nevertheless, the United States Supreme Court analyzed the prosecutorial misconduct under a harmless error standard, finding that the *Doyle* violations did not "substantially influence" the jury's verdict within the meaning of *Kotteakos v. United States*, 328 U.S. 750 (asking whether the violation "had substantial and injurious effect or influence in determining the jury's verdict"). The Court reasoned that the record, considered as a whole, demonstrated that the State's references to Mr. Brecht's post-*Miranda* silence were infrequent and were, in effect, merely cumulative of the extensive and permissible references to his pre-*Miranda* silence; that "the evidence of guilt was, if not overwhelming, certainly weighty"; and that circumstantial evidence also pointed to his guilt. *Id*. at 639.

**MEMORANDUM DECISION AND ORDER - 60**

precedent to decide this claim. Because not all reasonable jurists would agree that the Idaho Supreme Court's decision was incorrect under federal law, the Court concludes that Severson has not shown entitlement to habeas corpus relief. Therefore, this claim will be denied on the merits under AEDPA's deferential standard.

### D. Claim 5.5 – Alleged Misconduct in Prosecutor's Closing Argument

Claim 5.5 is that the prosecutor "improperly appealed to the jury's emotions by seeking sympathy for the victim's family and inflaming anger against Mr. Severson." Dkt. 1, p. 42. Defense counsel did not object to these statements. Severson challenged the propriety of all of these statements on direct appeal in *Severson I*. State's Lodging B-5, pp. 84-87. Because no objections were made, the Idaho Supreme Court analyzed them under its fundamental error framework, which, as noted above, is essentially the same as the *Darden* and *Donnelly* due process standard. *See* State's Lodging B-8.

#### i.   Prosecutor's Statements about Mary's Family

Severson alleges the prosecutor "repeatedly sought to evoke the passions and emotions of the jury by … continually referencing the loss suffered by" Mary's family. Dkt. 1, p. 42. These statements include the prosecutor's discussion of Mary's extended visit to Colorado during late 2001, the fact that she came back to Idaho on December 18, 2001, and the observation that it was "her last Christmas with her family." *Id*. Severson alleges the prosecutor continued his "onslaught and sympathy appeal" during rebuttal closing by referring to Mary as not just a "picture of bruises" or a "decedent," but "a 35-

year-old mother of two boys," "a daughter," "a sister," and a person whose "life had a purpose" and "meaning." Dkt. 1, p. 42; State's Lodging A-17, p. 4146.

The Idaho Supreme Court found that the prosecutor's statements about Mary's family were "arguably improper" because they were comments that encouraged the jury to identify with the victim. State's Lodging B-8, p. 32. Nevertheless, these statements "did not constitute fundamental error" for the following reasons: The statements were not dwelled upon or used to support an argument that Severson receive a harsher punishment. Instead, the statements permissibly reiterated evidence that had been produced at trial. The Idaho Supreme Court further found that the statements about Mary's family were not of the nature that would not have impacted the fairness of Severson's trial or deprived him of due process and, therefore, concluded that the statements were not fundamental error. State's Lodging B-8, p. 32.

The Idaho Supreme Court's decision was not an unreasonable application of federal precedent. Each of the reasons relied upon by the Idaho Supreme Court is supported by the record. The jury was aware of Mary's family relationships through trial testimony. A similar claim was addressed in *Timmons v. Aldridge*, No. CIV-17-86-R, 2017 WL 2616146 (W.D. Okla. May 24, 2017), *report and recommendation adopted*, No. CIV-17-86-R, 2017 WL 2609088 (W.D. Okla. June 15, 2017). That court came to the same conclusion as the Idaho Supreme Court, which tends to show that the Idaho decision is within the bounds of a reasonable interpretation of *Darden* and *Donnelly*.

**MEMORANDUM DECISION AND ORDER - 62**

Timmons alleged her attorney was ineffective for failing to object to comments made by the prosecutor during opening statement regarding the victim's mother losing a son and his two children losing their father. She argued that these comments improperly elicited sympathy from the jury. The court concluded that Timmons failed to show how she was prejudiced by these comments because it was "undisputed that Mr. Lane died and indeed left his mother without a son and his children without a father." 2017 WL 2616146, at *8. In other words, it is to be expected that humans have family ties, it is to be expected that human deaths cause grieving to those who lose family members, and it is to be expected that the family ties and losses will become known to the jury in a first degree murder trial. Precisely because of the difficult human context of a trial centering on a death, criminal case jury instructions instruct the jurors about what is evidence, and what is not.

Here, given the overwhelming evidence in the record of Severson's guilt and the jury's knowledge of Mary's family ties, the prosecutor's comments about Mary's family ties did not infect the trial with unfairness as to make the resulting conviction a denial of due process, did not misstate the evidence, and did not implicate other specific rights. *Donnelly*, 416 U.S. at 643; *Darden*, 477 U.S. at 181-82. Reasonable jurists could disagree about whether the Idaho Supreme Court's decision was incorrect on the constitutional issue presented by this claim. Accordingly, habeas corpus relief under AEDPA is not warranted.

**MEMORANDUM DECISION AND ORDER - 63**

ii.   Prosecutor's Statements about Mary Speaking from the Grave

Severson alleges it was prosecutorial misconduct to "repeatedly s[eek] to evoke

the passions and emotions of the jury by referencing [Mary] speaking from the grave."

Dkt. 1, p. 42. For example, the prosecutor stated:

> And then when you look at, when somebody is Mary's age,
> 35, [] found laying on the couch dead, nobody knows why
> and there is no natural cause, then there is only three possible
> scenarios that we told you about the very first day of this
> case, ever so many months ago it seems like. It was either an
> accident, suicide, or a homicide. How do we distinguish these
> and how do we tell the difference between them? The only
> thing we have got in this case is what the house can tell us of
> why Mary died, what the business tells us of why Mary died.
> The Hydroxycut will tell us of why Mary died, and what
> Mary tells us about why and how she died. Mary does speak
> to us today 33 months later. Mary still speaks to us today. She
> is still telling us what happened that night and why she is
> dead.

State's Lodging A-17, p. 3987.

The Idaho Supreme Court found that the "statements that Mary was speaking from

her grave were somewhat inflammatory because they were likely designed to appeal to

the sympathies and passions of the jury." State's Lodging B-8, p. 31. The court

nevertheless found that the "comments did not, however, rise to the level of fundamental

error" because, placed in context, "the statements were simply referring to Mary's body

providing evidence about the circumstances surrounding her death, not to her calling out

for Severson's conviction." *Id*., p. 32. The court contrasted these statements from those in

a distinguishable case, where the prosecutor "actually stated that the victim was calling

**MEMORANDUM DECISION AND ORDER - 64**

for a conviction from his grave." *Id.*, p. 31 (citing *Rockman v. DeRobertis*, 717 F.Supp. 554 (N.D. Ill. 1989)).

Reviewing these comments against United States Supreme Court case law, the Court concludes that these remarks were derived from the scientific analysis of Mary's body, and, while couched in odd and unnecessary "speaking from the grave" terms, were not "wholly irrelevant to any facts or issues in the case" such that their "purpose and effect … could only have been to arouse passion and prejudice." *Viereck v. United States*, 318 U.S. 236, 247 (1943) (emphasis added) (footnote omitted). Prosecutors are permitted to "strike hard blows" rhetorically, so long as their remarks are tied to the facts and issues of the case. *See id.* at 248.

The Idaho Supreme Court's conclusion that the remarks were permissible was reasonable because the prosecutor meant that "Mary's body" itself provided "evidence about the circumstances surrounding her death," *see* State's Lodgings B-8, p. 32, and much of the evidence presented consisted of scientific opinions about the cause of death gleaned from the body. The Idaho Supreme Court's decision that these odd remarks about the grave "did not result in an unfair trial or deprive Severson of due process" comports with the holdings of *Darden* and *Donnelly*. *See id.*, p. 31. Accordingly, this Court concludes that this claim does not warrant habeas corpus relief on AEPDA review.

iii. <u>Statements Regarding Severson's Affair</u>

Severson also alleges that the prosecutor "sought to [inflame] the jury" by remarking on Severson's affair in an offensive way during closing argument. Dkt. 1, p. 43. He specifically challenges the following statements as prosecutorial misconduct:

- "So, Mary gets to come home in October to find that this 21-year old tramp has gone inside her house and painted her guest bathroom. And guess what she painted it to look like? The bathroom that Larry Severson and Jennifer Watkins stayed in at the bed and breakfast." (State's Lodging A-17, p. 4003.)

- "Yeah, [Mary] had some mild depression. Who wouldn't, after finding out your husband is screwing some 21-year-old, having an affair with some 21-year-old girl, and you're getting shipped back to Colorado. Who wouldn't be a little depressed about that, as a young woman?" (*Id.*, pp. 4039-4040.)

While acknowledging the "wide latitude" parties have in closing argument, the Idaho Supreme Court recognized that "the prosecutor's comments that Severson was 'screwing' a '21-year-old tramp' were inflammatory and, therefore, improper." State's Lodging B-8, p. 33. The Idaho Supreme Court nevertheless found the "statements did not result in prejudice, however, given the weight of the evidence against Severson and the numerous limiting instructions issued by the judge." *Id.* (footnote omitted). "Moreover," the court found, "Severson's affair with Watkins was established at trial and, therefore, the fact that the prosecutor used crude words to describe the affair did not result in

**MEMORANDUM DECISION AND ORDER - 66**

prejudice." *Id*. Thus, the Idaho Supreme Court concluded, "the statements were not prosecutorial misconduct and do not justify reversing Severson's conviction." *Id*.

On this record, the Court concludes that the Idaho Supreme Court's resolution of this claim was not unreasonable. No doubt, these statements were inappropriate and offensive; even the State condemns them as such. Dkt. 58, p. 92. Nevertheless, on federal habeas corpus review of the decision of Idaho's highest court, this Court makes only a narrow inquiry. The constitutional question is not whether these statements are improper—it is whether these statements "so infected the trial with unfairness as to make the resulting conviction a denial of due process," "misstated the evidence," or "implicated other specific rights of the accused such as the right to counsel or the right to remain silent." *Donnelly*, 416 U.S. at 643; *Darden*, 477 U.S. at 181-82.

The Idaho Supreme Court carefully considered this federal claim. Habeas corpus relief is warranted only if that court's application of the *Darden* and *Donnelly* standards was so obviously wrong that it is beyond any possibility for fairminded disagreement among reasonable jurists. *See Kayer*, 141 S. Ct. at 523.

This Court notes that the record contained evidence of the affair, that the existence of the affair was not a contested factual issue, and that the fact of the affair was presented to support motive. *See, e.g*., State's Lodging A-17, p. 3537-3546. Jennifer Watkins, the 21-year-old woman with whom Severson was having an affair, testified at trial that, during the month of October, Larry "stayed most of the nights" at her home. She also

**MEMORANDUM DECISION AND ORDER - 67**

testified that she and Severson had gone on out-of-town excursions and stayed together at the Baymont Inn and the Hearthstone Lodge. State's Lodging A-17, pp. 3546-3550. Mary would sometimes call Ms. Watkins' home looking for Severson; Mary called Ms. Watkins a "homewrecker." *Id.*, pp. 3546, 3550.

The jury had much evidence about Ms. Watkins, her age, her involvement with Severson, and her conversations with Mary; the prosecutor's crude words did not substantially detract from the evidence presented at trial; the jury had plenty of actual evidence from which to fact-find about nature of the affair and whether it was a motive for the murder. In addition, the jury was repeatedly instructed that the attorneys' arguments were just arguments and not to be considered as evidence. *See* State's Lodgings A-9, pp. 1676, 1679, 1694 (Instruction nos. 15, 18, 33); A-16, pp. 902-905; A-17, pp. 2360, 3436-37.

Yet, the particular terminology selected by the prosecutor was calculated to inflame the jury—there is no other reason to use such verbiage in a court of law, where attorneys know that, as officers of the court, decorum and discretion are required of them. Was the trial rendered unfair by the prosecutor's crude description of Severson's affair? Comparing the improper remarks here to those in *Darden*, the Court concludes that the Idaho Supreme Court's decision was within the realm of reasonableness.

In *Darden*, the United States Supreme Court acknowledged that the prosecutor's closing argument was "undoubtedly … improper" and "deserve[d] the condemnation it

**MEMORANDUM DECISION AND ORDER - 68**

has received from every court to review it." 477 U.S. at 179-80. Among other things, the

*Darden* prosecutors referred to the defendant as an "animal," mentioned the death penalty

in the guilt-phase proceedings, and made additional outrageous statements about Mr.

Darden:

- "He shouldn't be out of his cell unless he has a leash on him and a prison guard at the other end of that leash."

- "I wish [Mr. Turman] had had a shotgun in his hand when he walked in the back door and blown his [Darden's] face off. I wish that I could see him sitting here with no face, blown away by a shotgun."

- "I wish someone had walked in the back door and blown his head off at that point." "He fired in the boy's back, number five, saving one. Didn't get a chance to use it. I wish he had used it on himself."

- "I wish he had been killed in the accident, but he wasn't. Again, we are unlucky that time."

*Id*. at 181, n.12 (record citations omitted).

The United States Supreme Court considered several factors in deciding whether

the prosecutor's inflammatory comments deprived Mr. Darden of a fair trial. The

prosecutors' remarks did "not manipulate or misstate the evidence, nor did [they]

implicate other specific rights of the accused such as the right to counsel or the right to

remain silent." *Id*. at 181-82. The "weight of the evidence against" Mr. Darden was

"heavy," and the trial court repeatedly instructed the jurors that their "decision was to be

made on the basis of the evidence alone, and that the arguments of counsel were not

evidence." *Id*. at 182. Based on all of these factors, the United States Supreme Court

**MEMORANDUM DECISION AND ORDER - 69**

found that the remarks did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Id*. at 181 (quoting *Donnelly,* 416 U.S. at 643.

In Severson's case, the prosecutor's unprofessional and crude remarks are not as offensive or irrelevant as the malicious comments in *Darden*, where the United States Supreme Court did not find a due process violation or other reversible error. Here, as in *Darden*, the prosecution's case against the defendant was strong. In Mr. Darden's case, the comments had no relevance to the evidence in the case. In Severson's, it was undisputed that Severson was carrying on an affair with a much younger woman in a flagrant manner, and that Mary was trying to put a stop to it.

Another comparison case is *Berger v. United States*, *supra*, where the United States Supreme Court held that prosecutors have a "duty to refrain from improper methods calculated to produce a wrongful conviction." 295 U.S. at 88. There, Mr. Berger was charged with conspiracy to pass known counterfeit notes. Upon a challenge to the prosecutor's conduct at the jury trial in which Mr. Berger was found guilty, the United States Supreme Court scrutinized the record and reversed the conviction:

> That the United States prosecuting attorney overstepped the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense is clearly shown by the record. He was guilty of misstating the facts in his cross-examination of witnesses; of putting into the mouths of such witnesses things which they had not said; of suggesting by his questions that statements had been made to him personally out of court, in

MEMORANDUM DECISION AND ORDER - 70

> respect of which no proof was offered; of pretending to
> understand that a witness had said something which he had
> not said and persistently cross-examining the witness upon
> that basis; of assuming prejudicial facts not in evidence; of
> bullying and arguing with witnesses; and, in general, of
> conducting himself in a thoroughly indecorous and improper
> manner.
> …
>
> The prosecuting attorney's argument to the jury was
> undignified and intemperate, containing improper
> insinuations and assertions calculated to mislead the jury.

*Id*., 295 U.S. at 84–85.

In *Berger*, while the trial court sustained objections to some of the prosecutor's questions and instructed the jury to disregard them, the United States Supreme Court found those efforts insufficient and that only a new trial would remedy the prosecutorial misconduct. This is not "a case where the misconduct of the prosecuting attorney was slight or confined to a single instance," the Supreme Court reasons, "but one where such misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential." *Id*. at 89. Key to the *Berger* decision was that the case against Mr. Berger was weak; the Supreme Court observed that, had "the case against Berger been strong, or, as some courts have said, the evidence of his guilty 'overwhelming,' a different conclusion might be reached." *Id*. at 88-89. Here, there is overwhelming evidence of Severson's guilt; therefore, the prosecution's comments were far less likely to contribute to an unfair trial.

**MEMORANDUM DECISION AND ORDER - 71**

Because fairminded jurists can, and did, disagree on the correctness of the Idaho Supreme Court's opinion on this claim, and the opinion is not clearly contrary to United States Supreme Court precedent, Severson has not shown that federal habeas corpus relief is warranted under AEDPA's deferential standard of review.

    iv.  <u>Claims based on Prosecutor Statements Rejected on Procedural Grounds</u>

Severson asserts that the following two closing argument statements amounted to procedural misconduct: "I would love to talk to Mary Severson and find out, on the early-morning hours of February 15th, how she was feeling," and "[t]here is no innocence in this courtroom except the innocence of Mary Severson." State's Lodging B-4, p. 98.

The Idaho Supreme Court summarily dismissed these claims in *Severson I*, applying *State v. Zichko*, 923 P.2d 966, 970 (1996) (holding that Idaho appellate courts will not consider claims that are not supported with argument and authority in appellate briefing). The Idaho Supreme Court found that appellate counsel provided no argument and authority addressing the subject matter of these two statements; therefore, the court refused to address the claim on appeal. *See* State's Lodging B-8, p. 31, n. 33. *Zichko* is an adequate and independent state procedural ground for dismissal of such bare claims.

Severson brought these claims again, albeit with an ineffective assistance of counsel overlay, in his post-conviction action in *Severson IV*. In the context of determining the ineffective assistance claims, the Idaho Court of Appeals determined that the two statements, including an expanded version of the "innocence" statement, *see*

**MEMORANDUM DECISION AND ORDER - 72**

State's Lodging H-1, p. 25, were permissible closing argument and, therefore, they did not constitute prosecutorial misconduct. State's Lodging H-4, p. 13.

Nothing in the record shows that these statements infected the trial with unfairness as to deny Severson the right to a fair trial or that they otherwise denied him fundamental constitutional rights. *Darden*, 477 U.S. at 181- 91 82; *Donnelly*, 416 U.S. at 643. The first statement is based on a nonsensical idea that a living person can ask a deceased person a question. Reasonable jurors would disregard the comment as nonsensical, rather than be swayed by it. The second comment fairly depicts that, at the end of the trial, the jury will decide whether Severson is guilty, thus ending his status as "presumed innocent until proven guilty." When the case reaches closing arguments, the prosecution is expected to argue that the defendant is guilty; there is nothing inherently wrong about the "no innocence" closing argument.

The Court agrees with the Idaho Court of Appeals' analysis of the prosecutorial misconduct claims underlying the ineffective assistance of claims decided on appeal in *Severson IV*. No prejudice resulted from these statements, especially given the overwhelming evidence of Severson's guilt. Therefore, these claims do not warrant habeas corpus relief under either a deferential or a de novo review standard.

### 6.  Discussion of Claim 6: Trial Counsel Failures

Claim 6 is that trial counsel was ineffective for failing to object to closing argument statements that "could have ignited passion and prejudice in the jury." Dkt. 1,

p. 47. Severson challenges counsel's failure to object to a total of thirteen statements, nine of which were addressed on appeal of his post-conviction petition in *Severson IV*. State's Lodging H-4, pp. 6-10. The remaining four claims were not addressed because Severson failed to support them with argument and authority on appeal. *Id*., p. 6 n.1.

The clearly established law governing a Sixth Amendment claim of ineffective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on an ineffective assistance claim, a petitioner must show that (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness, and that (2) the petitioner was prejudiced by the deficient performance. *Id*. at 684.

In assessing trial counsel's performance under *Strickland*'s first prong, a reviewing court must assess counsel's conduct at the time that the challenged act or omission occurred, making an effort to eliminate the distorting lens of hindsight. *Id*. at 689. The court must indulge in the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id*.

In assessing prejudice under *Strickland*'s second prong, a court must find that, under the particular circumstances of the case, there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id*. at 684, 694. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id*. at 694.

**MEMORANDUM DECISION AND ORDER - 74**

A petitioner must establish both deficient performance and prejudice to prove an ineffective assistance of counsel claim. 466 U.S. at 697. On habeas review, the court may consider either prong of the *Strickland* test first, or it may address both prongs, even if one is deficient and will compel denial. *Id.*

The *Strickland* standard, giving deference to counsel's decisionmaking, is the de novo standard of review. Another layer of deference—to the state court decision—is afforded under AEDPA. In giving guidance to federal district courts reviewing *Strickland* claims on habeas corpus review, the United States Supreme Court explained:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." *Williams*, *supra*, at 410, 120 S.Ct. 1495. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Richter*, 562 U.S. at 112.

There is no precedent from the United States Supreme Court providing a standard for mandatory or recommended objections to a prosecutor's closing argument. It is common knowledge that many lawyers refrain from objecting during opening statement and closing argument, so as to avoid drawing attention to the opposing party's argument

**MEMORANDUM DECISION AND ORDER - 75**

and because the jury is always instructed that attorney argument is not testimony or evidence. For example, the United States Court of Appeals for the Ninth Circuit has held that, absent egregious misstatements by opposing counsel, the failure to object during closing argument and opening statement is within the "wide range" of permissible professional legal conduct. *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993), *as amended on denial of reh'g* (Apr. 15, 1993); *Cunningham v. Wong*, 704 F.3d 1143, 1159 (9th Cir. 2013) (holding that not objecting to a closing argument to avoid highlighting improper comments is a reasonable strategic decision); *Featherstone v. Estelle*, 948 F.2d 1497, 1507 (9th Cir. 1991) (holding, on habeas review, that counsel's failure to object to improper argument at trial did not prejudice petitioner where other evidence supported a guilty verdict and the jury was told closing argument was not evidence). These cases, while not of precedential value under AEDPA, show whether the Idaho Court of Appeals' similar holding is a reasonable interpretation of *Strickland*. The Court now considers each claim or subset of claims.

### A. Permissible Closing Argument – Claims 6(c), 6(f), 6(j), 6(k), 6(l)

Severson argues trial counsel was ineffective for not objecting to the following statements in closing argument.

#### i.   Claim 6(c) (corresponding to Claim 1(a) in State's Lodging H-4)

Claim 6(c) is that trial counsel did not object to the prosecutor's statement, "And as the phone is ringing and as she [Nora Law] is talking to one of Mary's friends, Teresa

Mallea, [Mary] is not breathing, she is not moving, 'Come back to us Mary, come back to us.'" Dkt. 1, p. 47; State's Lodging H-4, p. 6; State's Lodging A-17, p. 3986.

The Idaho Court of Appeals concluded that this was permissible closing argument. It was a slight misstatement of an exclamation made to the 911 operator, but it is substantially similar to the actual recorded statement. A review of the record shows that this was a reasonable factual finding based on the transcript of the 911 dispatch call played at trial. *See* State's Lodgings G-5, p. 845; A-16, pp. 975-979 (The transcript shows: "Come on, Mary"; "Are you guys doing CPR on her?"; "Yes, yes."; "Oh Mary, come on, Mary. Breathe, Mary."). Because the argument was permissible, trial counsel was not deficient for not objecting to it. Because an objection would not have been sustained, there is no prejudice to Severson's defense. The Idaho Court of Appeals' opinion rejecting this claim on *Strickland* grounds is reasonable, based on this record. This claim will be denied on the merits under the AEDPA deferential standard.

ii.  Claim 6(f) (corresponding to Claim 1(b) in State's Lodging H-4)

Claim 6(f) is that trial counsel did not object to the prosecutor's statement, "Could [someone else have tampered with Mary's medicine]? I suppose, in the same way that there are little green aliens could be coming to us from Mars or something. It is possible in one way, shape, or form that that's exactly what somebody did." Dkt. 1, p. 7; State's Lodging H-4, p. 6; State's Lodging A-17, p. 4052.

**MEMORANDUM DECISION AND ORDER - 77**

The Idaho Court of Appeals concluded that this argument was a permissible inference from the State's evidence and its theory that only Severson had the opportunity to tamper with Mary's medicine. State's Lodging H-4, p. 6. It was undisputed that someone had tampered with Mary's Hydroxycut pills by opening them and inserting something like Drano. Severson had access to Mary's medications. Mr. Frachiseur spent a considerable amount of time during his own argument pointing out reasons Severson would not have been the person to poison the pills, and, thus, not objecting to the prosecutor's sarcastic one-liner was not necessary.

Because the argument was permissible, trial counsel was not deficient for not objecting to it. Because an objection would not have been sustained, there is no prejudice to Severson's defense. Therefore, the Idaho Court of Appeals' opinion that trial counsel was not ineffective was a reasonable interpretation of federal law. This claim will be denied on the merits under the AEDPA deferential standard.

### iii. Claim 6(j), 6(k), and 6(l) (corresponding to Claims 1(c), (d), and (e) in State's Lodging H-4)

A number of the prosecutorial misconduct claims relate to the prosecutor's references to Severson's affair with Jennifer Watkins.

- Claim 6(j) is a statement that, "Please don't hold that fact, that [a prosecutor] may have said [the defendant's girlfriend] was nineteen instead of the ripe old age of 21. Or, she still looks like she is about 19." Dkt. 1, p. 47; State's Lodging H-4, p. 6; State's Lodging A-17, p. 4119.

- Claim 6(k) is a statement that, "And I guess all the witnesses say that they saw [Severson] running around with a girl they thought was his daughter, who was a teenager, who was all of age 18 or 19. That may have been playing in [the prosecutor's] mind." Dkt. 1, p. 47; State's lodging H-4, p.6; State's lodging A-17, pp. 4119-4120.

- Claim 6(l) is a statement that, "We are done: Mr. Frachiseur and I, and Mr. Matthews and Mr. Howen. Our job here before you is complete. Innocent until proven guilty, yes. Today ends that preposition [sic]. There is no innocence in this courtroom except the innocence of Mary Severson. She didn't have to die. The only reason she did was the lust and greed of the defendant to get out of a marriage rather than divorce so he could get all the money and then some; and he could pursue his other women, not this fat woman that he saw in front of him who refused to give him the divorce." Dkt. 1, p.47; State's Lodging H-4, p. 6; State's Lodging A-17, p. 4145.

The Idaho Court of Appeals concluded that these statements were permissible argument to point out the State's evidence and its theory that Severson "murdered Mary to avoid an expensive divorce, to recover life insurance proceeds, and to resume his relationship with a younger, thinner woman." State's Lodging H-4, pp. 6-7. Because the statements were not objectionable, "trial counsel was not deficient for failing to object to them." *Id*.

Based on the entire record, the Court agrees that a court could reasonably conclude that the arguments were permissible. The record contains undisputed evidence that Severson was having an affair with a younger woman, Jennifer Watkins. Because Ms. Watkins testified at trial, the jury had adequate opportunity to see and hear her. State's

**MEMORANDUM DECISION AND ORDER - 79**

Lodging A-17, p. 3537-3563. She testified of the month, day, and year of her birthday. *Id*., p. 3537. Severson became engaged to her during his marriage to Mary. As noted above, Ms. Watkins testified that Mary would call her from time to time and try to dissuade her from continuing the affair, calling her a "homewrecker." *Id*., p. 3550.

Severson contends that the prosecution consistently misrepresented Ms. Watkins' true age in an effort to inflame the jury, and yet his trial attorney did not object. The record reflects that, not only did Ms. Watkins state her birth date, both attorneys addressed the age mistake in their closing arguments. Mr. Frachiseur argued that the State thrice purposely misstated Ms. Watkins' age as 19 in closing argument to bolster their "story." *Id*., p. 4109. In rebuttal, Mr. Bazzoli said to the jury, "If for some reason, [because of ] Mr. Howen, you feel that we misled you by saying that the girl's age was 19, you will remember statements of facts from the defense counsel and the prosecution are not facts." *Id*., p. 4119.

The record is clear that, rather than object, Mr. Frachiseur skillfully made a strategic choice to use the prosecution's misstatement of Ms. Watkins' age and the insinuations that she was a young teenager in his closing argument to paint the prosecution as untruthful. That accomplished more than was possible had he made a mere "non-speaking" objection. Because the failure to object was strategic and the remarks were better used in the defense's closing argument, there was no prejudice to Severson's defense. For all of these reasons, the Idaho Court of Appeals' opinion was not contrary

**MEMORANDUM DECISION AND ORDER - 80**

to, or a reasonable application of, *Strickland.* This claim is subject to denial on the merits under both the AEDPA deferential standard and the de novo review.

### B. Ambiguous Remark (Silence) – Claim 6(m) (corresponding to Claim 2(a) in State's Lodging H-4)

Claim 6(m) is that the prosecutor committed misconduct by referring to Severson's decision to remain silent when the prosecutor argued: "[Mary's] mouth opened easily. No one else in this courtroom has testified in front of you, that was there, that they injured Mary Severson's face." Dkt. 1, p. 47; State's Lodging H-4, p. 7; State's Lodging A-17, p. 4138.

In context, it is quite clear that the prosecutor was arguing that, of the witnesses who testified about efforts to resuscitate Mary, no one testified that they injured her face during resuscitation attempts. Severson's son, Michael Rutherford, testified that he did not have a hard time opening Mary's mouth to begin CPR when he arrived. *Id.*, p. 3174. Mr. Frachiseur's closing argument contained extensive argument about many witnesses, including doctors and a funeral director, who described Mary's bruising and facial injuries as resuscitation wounds. State's Lodging A-17, pp. 4093-4101. Mr. Frachiseur described how Mary's two mouth wounds were symmetrical, which indicated that they were both caused at the same time by the same force—the equipment that paramedics used. He described how rough the paramedics were in trying to resuscitate people, because their main focus is to restart breathing within a small window of time before serious brain damage occurs. *Id.*

MEMORANDUM DECISION AND ORDER - 81

The Idaho Court of Appeals applied the principle from *Donnelly*, also applied by the Idaho Supreme Court in *Severson I*, that courts are not to "lightly infer" that the prosecutor's remark meant the worst. State's Lodging H-4, p. 7-8 (quoting State's Lodging B-8, p. 30 (quoting *Donnelly*, 416 U.S. at 647).) The Idaho Court of Appeals acknowledged that the comment was "ambiguous," and "may have been objectionable, but only if" it was "given [the] most damaging possible interpretation" of being a comment on Severson's silence. State's Lodging H-4, p. 7.

This Court concludes that the Idaho Court of Appeals' decision to refrain from giving the comment its worst possible interpretation—a comment upon the defendant's silence—is well-supported by the context in the record. Trial counsel was not deficient for failing to object; nor did the comment prejudice the defense. State's Lodging H-4, p. 8. This claim will be denied on the merits under AEDPA's deferential standard.

### C.  Statements Already Addressed On Direct Appeal – Claims 6(d), 6(e)

In *Severson IV*, Severson claimed that trial counsel should have objected during trial to two statements about the Jennifer Watkins affair that the Idaho Supreme Court had addressed and rejected as alleged prosecutorial misconduct in *Severson I*: the "21-year-old tramp" statement (Dkt. 1, p.47; State's Lodging H-4, p. 8; State's Lodging A-17, p. 4003), and the "screwing some 21-year-old" statement (Dkt. 1, p. 47; State's Lodging H-4, p.8; State's Lodging A-17, p.4039-40).

Counsel objected to these statements post-trial in a motion for a new trial. State's Lodging H-4, p. 9. Therefore, the Idaho Court of Appeals "declined to consider" these two statements on post-conviction review because "trial counsel actually did object to them"; in addition, the Idaho Supreme Court in *Severson I* previously considered and rejected the claims on the merits during direct appeal, finding that the statements did not amount to prosecutorial misconduct and were not prejudicial to the defense. State's Lodging H-4, pp. 8-9; State's Lodging B-8, p. 3.

The Idaho Court of Appeals went on to address the merits of the claims, finding that "the [Idaho Supreme] Court's holding of no fundamental error … conclusively established that Severson was not prejudiced by the statements" for purposes of *Strickland* review. State's Lodging H-4, p. 9.

A review of the record shows that an objection at trial to the crude language likely would have yielded little more than an admonition from the court to tone down the dramatic language. As noted above, the jury had opportunity to hear and see Ms. Watkins, and determine the nature of the affair for themselves. Because the fact of the affair was undisputed and was presented to show a motive for the crimes, no prejudice resulted. Therefore, the Court of Appeals' opinion is reasonable, because neither prong of *Strickland* is met. Hence, this claim is subject to denial under AEDPA's standard of review.

**MEMORANDUM DECISION AND ORDER - 83**

### D. Objectionable, But Harmless, Argument – Claim 6(h) (corresponding to Claim 3(a) in State's Lodging H-4)

In Claim 6(h), Severson asserts that trial counsel should have objected to the following statement: "All we know is that according to Dr. Dawson, the State's expert in this case—I think a very credible individual, with nothing to lose in this matter—gave you a good answer as to how he figured out the [total' number of pills Mary ingested]." Dkt. 1, p. 48; State's Lodging H-4, p. 8; State's Lodging A-17, p. 4125. Severson presented this claim in *Severson IV*. State's Lodging H-4, p. 22.

Mr. Gary Dawson is a pharmacologist who worked part-time for the Ada County Sheriff's Department, in addition to his job as a regional director of medical affairs for an international pharmaceutical company in Boston. State's Lodging A-17, p. 1782. He testified that there was the equivalent of about 8 to 12 Unisom tablets in Mary's body at the time of death, calculated from the amount of that medication found in her blood. *Id.*, p. 1808. He also testified that Mary had the equivalent of about 4 to 6 Ambien tablets in her body. *Id.*, p. 1814. Mr. Dawson concluded: "It is my opinion based upon a degree of medical certainty that this combination of the drugs at those levels could cause death; but it is my estimation is unlikely that they caused death." *Id.*, p. 1831. Dr. Groben, the State's forensic pathologist, testified that Mary could have died from an overdose of sleeping pills or smothering. *Id.*, p. 4032. Dr. Gray, the defense's forensic pathologist, testified that that Mary died from an overdose. *Id.*

MEMORANDUM DECISION AND ORDER - 84

Mr. Dawson's testimony bolstered the State's pathologist's opinion and formed the foundation of the theory that Severson tried to kill Mary with Drano-laced Hydroxycut pills; then with tranquilizers borrowed from a friend; then with sleeping pills, but when Mary was still alive after the sleeping medication overdose, he ended up suffocating her while she slept. *Id*., pp. 4060-4061. The prosecution wanted to show, beyond a reasonable doubt, that Mary's death was not an accident or suicide. Mr. Dawson's testimony was important to show that Mary had a dosage of sleeping medications in her bloodstream that probably was not quite enough to be fatal, and so an additional factor had to be added to the mix to kill her, which the prosecution argued was suffocation. In closing argument, the prosecution improperly told the jury that he thought Mr. Dawson was both credible and unbiased.

The Idaho Court of Appeals recognized that clearly established Supreme Court law prohibits prosecutors from vouching for a witness's credibility. *Lawn v. United States*, 355 U.S. 339, 359-360 n.15 (1958). State's Lodging H-4, p. 8. Thus, the comment clearly was prosecutorial misconduct. Because the comment occurred in rebuttal argument, the appellate court considered the reason for the lack of objection, finding that there was no evidence in the record that "trial counsel was unaware witness vouching is impermissible or that he was otherwise not prepared." *Id*. Therefore, the court concluded that trial counsel's decision not to object "was likely not a performance deficiency but rather a strategic decision." *Id*.

**MEMORANDUM DECISION AND ORDER - 85**

This conclusion is bolstered by the record. Mr. Frachiseur did not simply sit passively and do nothing throughout closing arguments. He *did* make an objection to Mr. Bazzoli's closing arguments on another point, which shows that whether to object likely was a conscious decision. In rebuttal argument, the prosecutor said that Severson knew that if he did not make the murder look like an accident, he would have lost the $200,000 life insurance because of its suicide exemption clause. State's Lodging A-17, p. 4130-4131. Mr. Frachiseur objected. The trial court overruled the objection, and Mr. Bazzoli instantly stated to the jury, "Let's talk about Mr. Frachiseur's objection, since he brought up the life insurance policy." *Id.*, p. 4131.

Hence, the objection Mr. Frachiseur *did* make served to highlight the issue, not prevent its inclusion in the prosecution's argument. That is precisely why many attorneys do not object to closing argument statements. Counsel do not have crystal balls to know when an objection on questionable content is going to be sustained, when it is better to let the content pass hardly noticed, or when to address it in rebuttal. They must make a split-second choice based on their training and experience and, absent egregious conduct, *Strickland* mandates that court must indulge in the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. 466 U.S. at 684. A reviewing court must assess counsel's conduct at the time that the challenged act or omission occurred, making an effort "to eliminate the distorting lens of hindsight." *Id.* at 689.

**MEMORANDUM DECISION AND ORDER - 86**

In a split second, Mr. Frachiseur chose not to object, which might have highlighted the vouching. He must have known his argument had been strong, because Mr. Bazzoli was scrambling to rebut it—shown by the vouching error and other less-than-prudent comments. The Idaho Court of Appeals called the single instance of vouching "fleeting." On this record, the Idaho Court of Appeals determined that Severson "failed to overcome the strong presumption" that Mr. Frachiseur's performance "was within an acceptable range and that the lack of objections was strategic." State's Lodging H-4, p. 8.

On federal habeas corpus review, AEDPA requires a doubly deferential review. The *Severson IV* court was required to, and did, presume that counsel's performance fell "within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. 689, and, in turn, this Court is required to give deference to the Idaho Court of Appeals' findings and conclusion. Severson has not come forward with anything showing that trial counsel did not purposely remain silent, so as not to draw attention to the "fleeting" vouching comment. Mr. Frachiseur and Mr. Ellison were competent and experienced death penalty qualified defense attorneys; Mr. Frachiseur's level of expertise and skill is exemplified in his closing argument.

To be sure, prosecutorial vouching for witnesses violates the United States Constitution, and this particular instance is a textbook example of prosecutorial misconduct. No reasonable jurist could disagree with that. However, with a harmless error analysis overlay (as in *Severson I*) or ineffective assistance overlay (as in *Severson*

**MEMORANDUM DECISION AND ORDER - 87**

*IV*), reasonable jurists could disagree as to whether the defense was prejudiced by the comment and whether Severson's counsel was deficient. There was an extreme battle of the experts in this case, and the scientific evidence portion of the case turned on which expert's opinion should be believed. The prosecutor's suggestion that the State's witness was both credible and unbiased may have caused the jurors to give Mr. Dawson's opinion more weight.

Nevertheless, Respondent correctly emphasizes that the fact that the prosecutor's remark was found to be objectionable does not change the deficient performance analysis. Mr. Frachiseur knew how to object to closing argument; nothing suggests he did not know that vouching for witnesses was misconduct; and Severson has not shown that Mr. Frachiseur failed to object out of negligence rather than choice and strategy.

In addition, scientific evidence in this case would not have carried the day; therefore, the fleeting voucher for Mr. Dawson's testimony was not so prejudicial that it denied him a fair trial. Beyond the experts' opinions about causes of the face bruising and causes of death, there was simply no reasonable explanation from the defense about the poisoning of the Hydroxycut pills, which pointed to Severson as the perpetrator because of timing and opportunity; why Severson spread the story among acquaintances that Mary's doctor told him Mary had terminal cancer but Mary's doctor would not tell Mary she had cancer; or why Severson withheld knowledge of Mary's Ambien and Unisom medications from his daughter-in-law and the emergency room doctor. In addition, other

evidence as to motive and planning was very strong. The fact that Severson's and Mary's assets were in Mary's name, making divorce unpalatable for Severson, was made clear in Jennifer Watkins' testimony. She asked Severson why his business checks said, "Mary Severson Auto Works," and Severson explained that, when he first married Mary, he put everything in her name because his first ex-wife was trying to take all of his assets and he did not want to lose his business. State's Lodging A-17, p. 3541-3542.

Other strong motive evidence was that, far from being just a "fling," Severson and Ms. Watkins had purchased an engagement ring for Ms. Watkins; ordered a custom-made wedding dress for her; ordered bridesmaid dresses; picked a Lake Tahoe wedding venue; opened a joint bank account together; and painted, wallpapered, and redecorated Severson and Mary's bathroom to look like the one at the Hearthstone Inn, in anticipation of Severson and Ms. Watkins occupying Severson's home together. Even if the vouching did cause the jury to credit Dr. Dawson's testimony more than the other experts, the circumstantial evidence pointing to Severson as perpetrator was overwhelming.

Because reasonable jurists could disagree with the conclusion of the Idaho Court Appeals as to the unconstitutional vouching for an important expert witness, and because the Idaho Court of Appeals' opinion is a reasonable application of *Strickland* based on the record, federal habeas corpus relief on this claim is not warranted. This claim will be denied under AEDPA's deferential standard of review.

MEMORANDUM DECISION AND ORDER - 89

### 7.  Discussion of Claim 7: Cumulation of Trial Counsel Failures

Claim 7 is that, while each of trial counsel's failures to object during closing and rebuttal arguments alone may be insufficient to grant relief, the cumulative effect of the errors was that trial counsel was "constitutionally ineffective." Dkt. 1, pp. 49-50. Severson raised this claim on appeal of his post-conviction petition in *Severson IV*.

The Idaho Court of Appeals noted that Severson had raised a cumulative error type of ineffective assistance of counsel claim in the district court, but the district court erroneously analyzed it as fundamental error and not *Strickland* prejudice. However, the Court of Appeals concluded that, upon a proper *Strickland* analysis, only one of the asserted comments the prosecutor made during closing argument was determined to be prosecutorial misconduct (the vouching comment), and, thus, there were not two or more errors to cumulate under a *Strickland* prejudice analysis. State's Lodging H-4, pp. 10-11.

In addition, the Idaho Court of Appeals questioned whether there existed a cumulative error theory of relief under *Strickland*. *Id*., p. 11. Here, Respondent asserts that there is no United States Supreme Court precedent to support such a claim in federal habeas corpus review, and, if there is, the claim fails on the merits.

To the contrary, *Strickland* itself addressed and supports a theory that a single ineffective assistance claim can be "multifaceted," as thoroughly discussed in *Johnson v. United States*, 860 F. Supp. 2d 663, 756 (N.D. Iowa 2012) (citing *Strickland*, 466 U.S. at 675). For example, in *Strickland*, the claim was "ineffective assistance at the sentencing

proceeding," and it consisted of all of the following errors: sentencing counsel "failed to move for a continuance to prepare for sentencing, to request a psychiatric report, to investigate and present character witnesses, to seek a presentence investigation report, to present meaningful arguments to the sentencing judge, and to investigate the medical examiner's reports or cross-examine the medical experts." *Ibid.*; *see Harris By & Through Ramseyer v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995) (holding that, based on multiple serious errors committed by trial counsel throughout the trial, "there is a reasonable probability that, absent the deficiencies, the outcome of the trial might well have been different. *See Strickland*, 466 U.S. at 695.").

Accordingly, here, Severson's claim that trial counsel's multiple failures to object during closing argument can be construed as but one *Strickland* claim. The Idaho Court of Appeals determined Severson's multi-faceted *Strickland* claim by holding that only the prosecutor's rebuttal argument statement that vouched for the credibility of the State's expert witness was prosecutorial misconduct but nevertheless non-prejudicial, *see* State's Lodging H-4, p. 8, and, therefore, Severson failed to show that two or more of the prosecutor's comments constituted error, which precluded a *Strickland* prejudice analysis based on multiple instances of failure of trial counsel to make objections during the prosecutor's closing arguments.

Having reviewed the record, this Court concludes that the Idaho Court of Appeals' decision on Severson's multi-faceted ineffective assistance trial counsel claim is not

**MEMORANDUM DECISION AND ORDER - 91**

contrary to, or an unreasonable application of, United States Supreme Court precedent. Even if more than one of the asserted errors amounted to deficient performance, the Court agrees that the overwhelming evidence of Severson's guilt presented in 17 days of trial far outweighs the asserted errors, including failing to object to the "fleeting" vouching comment. To the extent that reasonable jurists could find the Idaho Court of Appeals' opinion debatable, that shows habeas corpus relief cannot be granted. Severson has not shown that every reasonable jurist would find the Idaho Court of Appeals opinion incorrect. Claim 7 will be denied on the merits under both an AEDPA deference standard and a de novo standard.

### 8.  Discussions of Claims 8 and 9: Direct Appeal Counsel Failures

In Claim 8, Severson alleges appellate counsel failed "to identify on direct appeal [*Severson I*] all of the prosecutor's objectionable statements." Dkt. 1, p. 50. Claim 9 alleges that appellate counsel additionally failed "to cite argument and/or authority in support of" his arguments regarding "certain improper statements made by the prosecutor." Dkt. 1, p. 51. Severson brought both claims in *Severson IV*. State's Lodging H-1, pp. 25-26.

The *Strickland* principles also apply to determining ineffective assistance of appellate counsel claims. *Evitts v. Lucey*, 469 U.S. 387 (1985). To show prejudice on appeal, a petitioner must show that his attorney failed to raise an issue obvious from the trial record that probably would have resulted in reversal. *See Miller v. Keeney*, 882 F.2d

1428, 1434 n.9 (9th Cir. 1989). If a petitioner does not show that an attorney's act or omission would have resulted in reversal, then he cannot satisfy either prong of *Strickland*: appellate counsel was not ineffective for failing to raise such an issue, and petitioner suffered no prejudice as a result of it not having been raised. *See Miller*, 882 F.2d at 1435.

"Effective legal assistance" does not mean that appellate counsel must appeal every question of law or every nonfrivolous issue requested by a criminal defendant. *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). "[N]othing in the Constitution" requires "judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable claim' suggested by a client." *Id*. at 754. "[T]he process of winnowing out weaker claims on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Burger v. Kemp*, 483 U.S. 776, 784 (1987) (internal citations and punctuation omitted).

## A. *Claim 8 – Failure To Raise Issues On Appeal*

Claim 8 is that Severson's direct appeal counsel failed to raise "each and every instance of alleged prosecutorial misconduct during closing and rebuttal argument." Dkt. 1, pp. 50-51. Severson argues that his direct appeal counsel raised some, but not all, of the alleged instances of prosecutorial misconduct out of negligence, not out of an effort to narrow the issues. Dkt. 1, p. 51.

MEMORANDUM DECISION AND ORDER - 93

Respondent argues that Claim 8 is procedurally defaulted for failure to fairly present the claim to the Idaho courts before raising it here. In the post-conviction action, Severson challenged only five of the statements (Claims 6(j), 6(k) 6(f), 6(h), 6(m), above), and the Idaho Court of Appeals addressed only those five. *See* State's Lodgings G-5, pp. 809-810; State's Lodging H-4, pp. 12-13.

The Idaho Court of Appeals' opinion addressed the underlying unobjected to alleged prosecutorial misconduct statements, and this Court also addressed them above in the section discussing Claim 6, in the context of the ineffective assistance of trial counsel claim based on failure to object to the alleged prosecutorial misconduct. *See* State's Lodging H-4, pp. 3-11. The Idaho Court of Appeals found, and the record supports the finding, that only one instance constituted misconduct, and, as a result, there were not two or more ineffective assistance of counsel deficiencies that could be cumulated. For the same reason, the claim that direct appeal counsel failed to raise all of the underlying alleged prosecutorial misconduct statement fails.

Even adding in the claims that were not addressed by the Idaho appellate courts, this Court still concludes that the prosecutorial misconduct during closing and rebuttal argument was permissible, with the exception of the vouching for the State's witness claim, and that the overwhelming evidence of Severson's guilt presented in 17 days of trial far outweighs the prosecutor's improper insertion of his own personal opinion into the case that the State's witness was very credible and unbiased. This was not a case

**MEMORANDUM DECISION AND ORDER - 94**

where the evidence was scant. The prosecutor's comments that edged on impropriety or were improper, one or all, did not unduly influence the jury, given the weight of the evidence. Severson's suggestion that Mary's death serendipitously came just as he was planning his wedding with Ms. Watkins, just when he realized that he financially could not afford a divorce, and just when some unknown person tampered with Mary's prescription medications is a conclusion that no reasonable jurist or juror would accept.

Having reviewed the record, this Court concludes that the Idaho Court of Appeals' decision on the claim that direct appeal counsel failed to raise every issue of alleged prosecutorial misconduct on appeal is not contrary to, or an unreasonable application of, United States Supreme Court precedent. *See id*. To the extent that reasonable jurists could find the Idaho Court of Appeals' opinion debatable, that would show only that habeas corpus relief cannot be granted. *See Richter*, 562 U.S. at 101 (holding that, if fairminded jurists could disagree on the correctness of the state court's decision, relief is not warranted under § 2254(d)(1)). Severson has not shown that every reasonable jurist would find the Idaho Court of Appeals' decision on this claim incorrect and unreasonable. Claim 8 will be denied on the merits and dismissed, under both an AEDPA deference standard (as to direct appeal counsel errors raised before the state appellate courts) and a de novo standard (adding those direct appeal counsel errors raised for the first time in this action).

MEMORANDUM DECISION AND ORDER - 95

### B. *Claim 9 – Failure To Cite Authority*

As discussed above regarding a portion of Claim 5.4, in *Severson I*, the Idaho Supreme Court refused to review two statements that Severson claimed amount to prosecutorial misconduct on *Zichko* grounds. The statements were: "I would love to talk to Mary Severson and find out, on the early-morning hours of February 15th, how she was feeling," and that "[t]here is no innocence in this courtroom except the innocence of Mary Severson." State's Lodging B-8, p. 31, n.33.

In *Severson IV*, Severson asserted that direct appeal counsel was ineffective for failing to include argument or authority in support of these claims.  The Idaho Court of Appeals determined that the two statements, including an expanded version of the "innocence" statement, *see* State's Lodging H-1, p. 25, were permissible closing argument and, therefore, did not constitute prosecutorial misconduct. State's Lodging H-4, p. 13. As this Court discussed earlier, in the context of Claim 5, the prosecutorial misconduct claims, Severson has provided nothing to show that the comments were impermissible or that prejudice resulted. Had direct appeal counsel cited authority and made argument to challenge these statements, the claims would not have been successful on the merits, because the challenged statements were permissible argument. Therefore, appellate counsel was not deficient for failing to raise them, nor did any prejudice to Severson's appeal result. The Idaho Court of Appeals' conclusion was a reasonable

application of *Strickland* and warrants deference here. Therefore, Claim 9 is subject to denial under AEDPA.

## RESPONDENT'S VAGUENESS DEFENSE TO CLAIM 10

Claim 10 is that the "district court was in error when it denied Mr. Severson's motion for a new trial based on Newly Discovered Evidence which would support a claim of actual innocence as to any [wrongdoing] by Mr. Severson." Dkt. 1, p. 52. In its prior Order, the Court rejected Respondent's argument that this claim is too vague to be actionable. Dkt. 54, p. 17. The Court determined that, in the context of the procedural history of this case, this allegation can refer to nothing but the denial of Severson's motion to file a third successive petition to seek a new trial. *See* State's Lodging I-1, pp.76-82. Because of this clear context, the Court liberally construed Claim 10 as asserting that the state district court erred in *Severson IV* by denying Severson's motion for a new trial based on newly-discovered evidence that would show his actual innocence. Dkt. 54, p.17.

Construed in this manner, Claim 10 fails to state a federal claim upon which relief can be granted for several reasons. First, when a petitioner's assertion of error arises not from a state court's adjudication of the conviction or sentence for which the petitioner is detained, but from a state court's later action in a post-conviction proceeding, such a claim does "not represent an attack on the prisoner's detention," and therefore is not a proper ground for habeas relief. *Franzen v. Brinkman*, 877 F.2d 26, 26 (9th Cir. 1989)

MEMORANDUM DECISION AND ORDER - 97

(per curiam). *Accord, Cooper v. Neven*, 641 F.3d 322, 331–32 (9th Cir. 2011). In simple terms, "[a]ny denial of due process in Petitioner's state [collateral] proceeding has not resulted in Petitioner's incarceration, which flows solely from his criminal sentences," and "[i]t is for this reason that "'errors in a state post-conviction review proceeding are [not] addressable through federal habeas corpus.'" *Baker v. Ryan*, No. CV-09-0333-PHX-SMM, 2010 WL 3168634, at *3 (D. Ariz. July 20, 2010) (quoting *Franzen*, 877 F.2d at 26), *report and recommendation adopted*, No. CV 09-0333-PHX-SMM, 2010 WL 3168640 (D. Ariz. Aug. 10, 2010); *see Pudelski v. Wilson*, 576 F.3d 595, 610-11 (6th Cir. 2009) (concluding that, when a petitioner's motion for new trial based on new evidence was filed *before* the direct appeal was filed, a claim arising from denial of that motion is deemed part of the original criminal proceedings and not a "collateral attack" on the conviction; but, a collateral attack made *after* direct appeal that is not a part of the criminal proceeding but a separate civil matter, is not the proper subject of a § 2254 federal habeas corpus petition).

Second, there exists no federal constitutional right guaranteeing a fair state collateral review proceeding. *Murray v. Giarratano*, 492 U.S. 1, 101 (1989) ("State collateral proceedings are not constitutionally required as an adjunct to the state criminal proceedings and serve a different and more limited purpose than either the trial or appeal."). Severson has pointed to no United States Supreme Court precedent that supports his position that the denial of the opportunity to file a third successive post-

conviction action to bring forward new evidence in support of one's assertion of actual innocence is a federal Constitutional violation.

Third, the United States Supreme Court has determined that a claim of actual innocence is not cognizable in a federal habeas corpus action. *Herrera v. Collins*, 506 U.S. 390, 404-05 (1993) (citing the only potential exception as a death penalty case). And, even if actual innocence was a cognizable basis for a federal habeas claim, the evidence against Severson was overwhelming, and new facts about Mary's prescription medications do not overcome the clear evidence that Severson tried to poison his wife and that he killed her, one way or another.

For these reasons, the Court will dismiss Claim 10 for failure to state a federal claim upon which relief can be granted. Based on the overwhelming evidence of guilt set forth herein, the Court also rejects Severson's claim of actual innocence as a gateway to permit the Court to hear any procedurally defaulted claim.

## RESPONDENT'S PROCEDURAL DEFAULT DEFENSE TO CLAIM 11

In its earlier Order, the Court gave notice to the parties that it would entertain further argument on whether Claim 11 was properly presented to the state courts as a federal claim or should be dismissed as procedurally defaulted.

### 1. "Identical Provisions" Standard of Law

For procedural default purposes, the mere similarity between a state law claim and a federal claim does not constitute fair presentation of the federal claim; general

references in state court to broad constitutional principles, such as due process, equal protection, and the right to a fair trial, are likewise insufficient. *See Duncan v. Henry*, 513 U.S. 364, 365-66 (1995); *see also Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999). However, a claim can be considered properly exhausted "when the contours of the federal and state constitutional rights are [not merely similar but] identical." *Sanders v. Ryder*, 342 F.3d 991, 1000-01 (9th Cir. 2003).

### 2.  Discussion of Whether Claim 11 is Procedurally Defaulted

Claim 11 is that the cumulative error doctrine should be applied in Severson's case, because of the large number of "irregularities during trial." Dkt. 1, p. 55. Severson raised this claim on direct appeal in *Severson I*, but cited only to *State v. Harrison*, 37 P.3d 1 (Idaho Ct. App. 2001), for the principle that trial errors may be aggregated to "show the absence of a fair trial." State's Lodging B-5, p. 89. But the Idaho Supreme Court determined that Severson proved only one instance of procedural misconduct, and so there were no others to be cumulated. State's Lodging B-8, p. 37. Of note, Justice Jones dissented, believing that the prosecutor's repeated misconduct during the closing and rebuttal arguments constituted sufficient egregious errors that should be cumulated to constitute fundamental error. *Id.*, pp. 37-45.

In its prior Order, the Court preliminarily concluded that, although Severson cited only to state law for this claim on direct appeal, this claim could be construed as stating a federal claim for relief under the Fourteenth Amendment's Due Process Clause, based on

MEMORANDUM DECISION AND ORDER - 100

the "identical provisions" principle. *See* Order at Dkt. 54, pp. 25-27. After reviewing the

supplemental briefing, the Court agrees with Respondent that the Idaho cumulative error

doctrine is significantly different from the federal cumulative error doctrine, so as to

require litigants to specify that they are making claims under the federal doctrine in order

to exhaust a federal cumulative error claim. In his case, Severson relied on only Idaho

case law, and did not cite to a federal source or indicate that he was making a federal

claim. Thus, the Court concludes that Severson's cumulative error claim is procedurally

defaulted. *See* State's Lodgings B-4 and H-1.

At the time of Severson's direct appeal, Idaho's cumulative error doctrine

contained a unique limitation not found in the corresponding federal doctrine. In Idaho,

"errors not objected to at trial that are not deemed fundamental may not be considered

under the cumulative error analysis." State's Lodging B-8, p. 37. The United States Court

of Appeals for the Ninth Circuit has expressly rejected this limitation, holding that the

federal court can consider unobjected-to errors "on cumulative error review," even where

the unobjected-to error "may not alone amount to plain error." *United States v. Wallace*,

848 F.2d 1464, 1476 n.21 (9th Cir. 1988); *see also United States v. Berry*, 627 F.2d 193,

200 (9th Cir. 1980) (clarifying that, in a "cumulative error" analysis, the court considers

"all errors and instances of prosecutorial misconduct which were preserved for appeal

with a proper objection or which were plain error"). In *United States v. Rogers*, 556 F.3d

1130, 1144 (10th Cir. 2009), the court explained:

**MEMORANDUM DECISION AND ORDER - 101**

> In situations involving "both preserved and
> unpreserved errors, cumulative-error analysis should proceed
> as follows: First, the preserved errors should be considered as
> a group under harmless-error review. If, cumulatively, they
> are not harmless, reversal is required." *United States v.
> Caraway*, 534 F.3d 1290, 1302 (10th Cir. 2008). If the
> preserved errors are cumulatively harmless, then "the court
> should consider whether those preserved errors, when
> considered in conjunction with the unpreserved errors, are
> sufficient to overcome the hurdles necessary to establish plain
> error." *Id*.

*Id*. at 1144. And, while several circuits have taken this view, it is important to note that

the United States Supreme Court has not issued an opinion addressing the contours of a

cumulative error claim.

The Idaho cumulative error doctrine is different in that it does not permit

cumulation of unobjected to error. The federal doctrine is also different because the

federal courts are permitted to cumulate plain errors, while the Idaho standard cumulates

only fundamental errors. *See State v. Perry*, 245 P.3d 961, 978 (Idaho 2010) (observing

that, "contrary to the federal plain error rule, in Idaho a trial error that does not violate

one or more of the defendant's constitutionally protected rights is not subject to reversal

under the fundamental error doctrine").

Based on these differences between the state and federal cumulative error

doctrines, the Court concludes that Severson did not properly exhaust a federal

cumulative error claim, and this Court cannot review a state cumulative error claim.

**MEMORANDUM DECISION AND ORDER - 102**

However, the Court rejects Respondent's argument that a federal cumulative error doctrine has not been clearly established. The Ninth Circuit Court of Appeals applied federal cumulative error in the context of habeas corpus review in *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007). The fact that a circuit split exists on an issue may indicate that the law is not  clearly established, but a split is not dispositive of the question. *Cf. Morgan v. Morgensen*, 465 F.3d 1041, 1046 n. 2 (9th Cir. 2006) (civil rights context) ("The fact that there was a potential circuit split on this issue does not preclude our holding that the law was clearly established."); *cf. Williams v. Bitner*, 455 F.3d 186, 193 n. 8 (3d Cir. 2006) (civil rights context) ("Even if our sister circuits had in fact split on the issue, we would not necessarily be prevented from finding that the right was clearly established.").

In examining the case law undergirding the Ninth Circuit's *Parle* decision, the Court notes that *Parle* relies heavily on *Chambers v. Mississippi*, 410 U.S. 284 (1973), where the United States Supreme Court considered a claim that the cumulative effect of certain trial court rulings frustrated the defendant's ability to develop an exculpatory defense. *Id*. at 290 n.3. That the Supreme Court decided the case upon the basis of cumulative error was clear: "We need not decide, however, whether this error alone would occasion reversal since Chambers' claimed denial of due process rests on the ultimate impact of that error when viewed in conjunction with the trial court's refusal to permit him to call other witnesses." *Id*. at 298.

**MEMORANDUM DECISION AND ORDER - 103**

The *Chambers* court emphasized that the due process impact of cumulative errors was not a new doctrine, but firmly based on well-established fair trial principles:

> We conclude that the exclusion of this critical evidence, coupled with the State's refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with traditional and fundamental standards of due process. In reaching this judgment, we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures. Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial.

*Id*. at 302–03.

Because *Chambers* did not pronounce a new fair trial due process standard of law for cumulative error, the *Parle* court applied traditional due process principles from *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). *Parle*, 505 F.3d at 927. Relying on both *Chambers* and *Donnelly*, the Ninth Circuit Court determined, under traditional due process principles, that cumulative error warrants habeas relief only where the errors have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (citing *Chambers*, 410 U.S. at 298, 302-303, and *Donnelly,* 416 U.S. at 643).

Therefore, assuming that there is clearly established law supporting existence of a federal cumulative error claim, the Court alternatively concludes that Severson is not entitled to relief. Under the federal doctrine, only improper conduct *found to be error*, not

**MEMORANDUM DECISION AND ORDER - 104**

improper conduct *alleged to be* error, can be cumulated under the federal doctrine.

Neither can procedurally defaulted claims be cumulated. *See Derden v. McNeel*, 978 F.2d

1453, 1454 (5th Cir. 1992) ("[F]ederal habeas corpus relief may only be granted for

cumulative errors in the conduct of a state trial where (1) the individual errors involved

matters of constitutional dimension rather than mere violations of state law; (2) the errors

were not procedurally defaulted for habeas purposes; and (3) the errors "so infected the

entire trial that the resulting conviction violates due process.") (internal quotation marks

omitted).

The only prosecutorial misconduct or error found in the record is the prosecutor's

comment that vouched for a witness during closing argument. Therefore, there are not

two or more prosecutorial misconduct errors to be cumulated. The cumulative error claim

will be dismissed as procedurally defaulted; alternatively, it will be denied on the merits

under the de novo review standard.

## ORDER

**IT IS ORDERED:**

1. The Petition for Writ of Habeas Corpus (Dkt. 1) is DENIED and DISMISSED
   with prejudice.

2. The Court will issue a certificate of appealability on Claim 6(h), the failure of
   trial counsel to object to the prosecutorial vouching for a witness claim; and
   Claim 7, the multi-faceted *Strickland* claim in which Severson challenges the

district court's denial of his claim for ineffective assistance of trial counsel based on the "cumulative effect" of the lack of objections to the prosecutor's closing and rebuttal arguments.

3. The Court does not find its resolution of the remainder of the claims to be reasonably debatable, and a certificate of appealability will not issue as to any other claims or issues. *See* 28 U.S.C. § 2253(c); Rule 11 of the Rules Governing Section 2254 Cases. If Petitioner files a timely notice of appeal, the Clerk of Court shall forward a copy of the notice of appeal, together with this Order, to the United States Court of Appeals for the Ninth Circuit.

4. Petitioner may seek a certificate of appealability from the Ninth Circuit on other claims by filing a request in that court.

DATED:  September 29, 2023

Honorable Raymond E. Patricco
Chief U.S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 106**